*156 The opinion of the majority of the court, Rogers, Huston, and Tod, Js., was delivered by
Tod, J.
The court are under obligation to the counsel, who gratuitously, I apprehend, as well as ably, have argued the question. It seems to be admitted that the rules of the common law must govern our decision.' Equally undisputed it appears to be, that in every criminal trial, without exception, there is precisely the same right of challenging a juror for cause, given to the commonwealth or to the prosecutor, which is given to the defendant. The law guards against all the approaches of error and falsehood as much on one side as on the other: and, in challenges for cause, no distinction is admitted between bias and predetermination of a juror against a defendant, and bias and predetermination in favour of a defendant. The law, in every case, is scrupulous to prevent even the possibility of undue bias. It does not deal' with a juror as with a witness; admit him, though it doubts him. The slightest ground of prejudice is sufficient. The prejudice itself need not be.made out — the probability of it is enough. One related, though by marriage only, as remotely as the ninth degree, to the defendant or the prosecutor, may be challenged off the jury for that cause. Any one, who, in any possible way, no matter how honestly, has been warped by any preconceived opinion which may affect his verdict, or has made up his mind what verdict he is to give, and declared it, is excluded. Nothing in the law can well be more extensive than this right of challenge propter affectum. In an attaint a juror was called. . His father had been one of the petit jury — but was then dead — so that there was no possible interest, yet the son was challenged by the pr.osecutor, and excluded from the jury; “for it is a presumption, (says the bools,) that he will not say, against the oath of his father.” 21 Vin. Ab. E. d. 216.
And all these matters of real or supposed taint, upon the fairness of a juror, are not to be left to the discretion of triors. There is to be no inquiry whether the firmness of the man may not enable him to give a true verdict when upon his oath, notwithstanding his previous opinions. The law makes no such experiment; but the moment that any such fact of relationship, of favour, enmity, bias, pr preconceived opinion is made out, it removes the juror without hearing one word further.
Such are the general rules of law', relative to challenges for cause. In this case Isaac W. Morris, being summoned and called as a juror on this trial, on an indictment for'murder, and he declaring a predetérmined opinion, and his inability from the dictates of conscience, to find this defendant, or any other defendant, guilty of murder in the first degree, no matter what the law might direct, or what the evidence and the facts might turn out to be; and he being, for that cause, challenged On the part of the commonwealth, *157 the question to be decided is, was the challenge good? My opinion continues the same as upon the trial, that the cause of challenge Is sufficient.
With those scruples of Mr. Morris I am not inclined to meddle. I may say thus far — it was manly and honourable in the juror to declare his sentiments: yet it does not seem to be material that the intimation of his unfitness to c!o justice in the case, came first from himself. If the court had overruled the challenge, and ordered Mr. Morris into the jury box, what degree o.f compulsion would have been necessary to oblige him to take the affirmation, which in his own heart he was determined to disregard, I do not know, nor will inquire. Clearly, if the prisoner has a legal right to a predetermined acquittal, founded on the conscientious scruples of those who may be called as jurors, it must be the business of the law to find out some means of assuring to him the benefit of his just claim.
Stripped of all colouring, the general right claimed in the argument, will, perhaps, be found to be the right of a defendant in the case of murder in the first degree, to evade, or rather to set aside the penalty of the law, by means of force employed by the court itself, coupled with falsehood, or something worse, by the jury; practised under the eye, and with the sanction of the court.
Forcing upon the jury one, two, or half-a-dozen like Mr. 1Mor-ris, and obliging them to .take a solemn affirmation which they must violate, is not the worst part of this doctrine; but, unanimity being necessary, the rest of the jury, who have no scruple, except to say the truth according to their oaths or affirmations, may be thus compelled to give a verdict against their better knowledge, or to some vile equivocation. It may well deserve reflection, by what rule of common justice, men who have no scruples against obedience to the law, but are ready to say the truth in their verdict, whatever may be the consequences, are to be put on a jury, and compelled to concur in one opinion with those who declare themselves to be, and actually are, bound by a tie of conscience, above all oaths, to deny the truth in every case where saying the truth may lead to that punishment which the laws have provided against murder in the first degree.
Opposed, as the claim here set up is to all the general rules of law, yet a distinction is attempted by the prisoner’s counsel, by virtue of which they say Mr. Morris ought to have been permitted to take his seat as a juror, or compelled to do it, if compulsion was necessary — because his purpose toacquit, in spite of all proof, arose not from any special favour to the prisoner — 'but was the consequence of an undistinguishing, abstract opinion, or prejudice, the benefit of which was by no means personal to the defendant, but equally ready for the acquittal of every other defendant in the same situation. Now, it is not alleged that any precedent or authority can be shown for this distinction: nor that any case exists *158 where a positive, fixed prejudication has been fully made out, that a challenge for that cause has been overruled, on account of the peculiar nature or cause of the prejudice, abstract or otherwise. The fact of predetermined condemnation, or of predetermined acquittal is all that ever has been, or ever well can be, inquired into. To go beyond that would be an impracticable refinement. Not only is this distinction without authority in the boohs, but it seems to me wholly unsupported by any reason; for, certainly, the mischief is the same whether the prejudice of jurors is general or special: there is the same perversion of truth, the same profanation of oaths, the same farce acted under the show of well and truly trying, the same prostitution of the solemn forms of criminal justice, and the same prostration of the law. If there is any thing in this distinction between abstract predetermination to acquit a criminal in spite of truth and law, and a particular prejudice applicable to one case only, that difference is, in my.opinion, rather against the argument; because he whose judgment is warped by accidental error or misinformation, may, perhaps, give up his prejudices when he comes to know all the circumstances of the case, which it will be utterly hopeless to expect from him whose disregard of law and of truth is founded upon no misrepresentation of persons or of facts; but is rooted in the conscience, and made a part of his religion.
Try this distinction by any test whatsoever, and it is clearly inadmissible. I will make a supposition, not impossible nor very improbable. Suppose an opinion, the reverse of that of Mr. Morris, infused into members of the community, founded upon religion and conscience, and a strict literal construction of the divine law, that wilfully to kill a man is always unlawful, and a mortal crime, even in one’s own self-defence — and a prisoner indicted and to be tried for murder, who acknowledges the fact of killing, but justifies the deed as done in the necessary protection of his own life — and, all peremptory challenges being exhausted, jurors are called, who, honest like Mr. Morris, declare beforehand that they are bound by a law, above all laws of the state, that if the fact of wilful killing is proved, it is murder, and they will soonér go to death themselves than let the prisoner escape — -and that what they say, we know they will do. In answer to a challenge for this cause, how would it sound for the court to tell the man that there was no help for him in the law on account of a nice distinction between a determination to condemn in general, and a determination to condemn in particular? Your challenge would have been good had the prejudices of the jurors against you been less outrageous and universal: as it is — you must go — but with one most excellent consolation, that as the prejudices under which you suffer are not confined to your case, the next innocent man that comes to be tried, on the same facts and under the same scruples, must go the same way.
As to authority, I have said there has been none produced against the validity of this challenge. It appears to me a mistake to cite *159 the high name of Chief Justice Tilgiiman as opposed to it. In Jlllen’s case there was no challenge of any kind. The court could not challenge, — and the juror being agreed to by both sides, the judges, as it appears to me, had no alternative but to punish his disobedience. . ^
It is said there is no instance of a challenge being allowed on account of the religious scruples of a juror. This may be so, with the exception of decisions by Presidents Franklin and Ross, in each of which, it is understood, a challenge of .this kind was sustained. With these exceptions it does not appear that the case has ever arisen. In England it could hardly arise, and'if it did, the right, or rather the practice of peremptory challenge on the part of the crown as well as the prisoner, would, probably, settle the question at once without debate.- In Pennsylvania peremptory challenges, in cases of felony, were never expressly taken from the commonwealth, until'by the act of assembly .of 1814. Besides, the sheriff, until the year 1805, had the nomination of jurors; and it is not likely that he would summon, to serve on capital trials, those whose conscientious persuasions were known to be abhorrent from such service. We may easily discover wherefore this right of challenge, though always existing in the law, has been so rarely called into use.
It has been exceedingly pressed upon us by the counsel, why, when a man’s life is at stake, decide a contested and doubtful point against the prisoner? Why not leave it to the legislature to dispel the uncertainty by a declaratory act? I would answer, there is no doubt in the case, nór ever has been since the first institutionof jury trials. There would, perhaps, be as much of imbecility as of caution, in stopping short at every ingenious argument in a criminal case, and waiting for an act of assembly to remove difficulties which exist only in argument. I do not say that this identical opinion of Mr. Morris has been discussed and decided in any book: but the principle has been settled for a length of time beyond all records. The perpetual rule is shortly expressed in the words of Coke: “He that is of a jury, must be liber homo; that is, not only a free man and not bond, but also one that hath such freedom of mind as he stands indifferent, as he stands unsworn.” Co. Lilt. 155, a. Here there is no description given of the prejudice which shall disqualify a juror. All opinions present and to come are shut out which have the effect of partiality. It ,is said to be one of the excellencies of the common law, that it applies to all changes in the modes and habits of society — to new prejudices, new errors, new truths— that it never can be out-grown by any refinements, and never out of fashion while the identity of human nature exists. It is a law which deals in things rather than in names; and, by it, no contrivance nor means whatsoever ought to be effectual, to select a jury for the purpose of destroying the innocent or screening the guilty. True, in a capital case, the decision of the court, on points of law *160 which are really doubtful, ought in favour of life to incline to the side of the prisoner. Yet, when we are told of the extreme severity of the punishment on conviction of murder in the first degree, it must not be forgotten that the infliction of death for certain kinds of atrocious murder, is the law of the community which we are bound to obey, and not suffer to be indirectly repealed. Nor, in my opinion, ought any thing short of positive authority to induce us to commence a practice fraught with so much danger of corruption, in criminal trials, as the putting of twelve men upon their oaths and solemn affirmations, some of them bound by their oaths and by the law to say the truth according to the evidence, and the rest of them bound as strongly by their conscience to deny the truth, with firmness and obstinacy, just in proportion to the atrocity of the facts in proof. So that the more aggravated the murder, so much more intense must be the struggle between conscience for the law and conscience.against the law. One thing only is certain; let the verdict in any such case be as it may, it involves a consequence which need not be named.
In fine, my opinion is, 1st, That scruples of conscience in a juror, no matter how genuine they are, if there is no challenge on either side for that cause, cannot be taken notice of by the law. 2d. But that scruples of a juror, whether real or not, (for into their genuineness no human tribunal can easily inquire,) amounting to a predetermination to condemn, or acquit a prisoner, disregarding the evidence, or disregarding the law, if declared by the juror, or otherwise made known, form a legal ground of principal challenge; and if either side thinks fit to challenge for that reason, the cause is sufficient.
It follows,' that, in my opinion, the challenge to Isaac W. Morris was rightly admitted; and that the motion for a new trial be denied.
Gibson, C. J.
The question has been argued in part as if it stood on a challenge by the juror himself. It would, however, be even more difficult to sustain such a challenge than that which has been made by the attorney general.- It is declared in the Constitution, (art. ix. sect. 3,) that “ no human authority can, in any case, control or interfere with the rights of conscience.” But what are those rights ? Simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever on the subject of religion; and to do, or forbear to do, any act for conscience sake, the doing or forbearing of which, is not prejudicial to the public weal. But solus populi suprema lex, is a maxim of universal application; and where liberty of conscience would impinge on the paramount right of the public, it ought to be restrained. Even Mr. Jefferson, than whom a more resolute champion of toleration perhaps never lived, claims no indulgence for any thing that is detrimental to society, *161 though it spring from a religious belief or no belief at all. His position is, (Notes on Virginia — Query, xvii.;) that civil government is instituted only for temporal objects, and that spiritual matters are legitimate subjects of civil cognisance no further than as they may stand in the way of those objects. He denies the right of society to interfere, only where society is not a party in interest,, the, question, with its consequences, being, between the man and his Creator; but as far as the interests of society are involved, its right to interfere on principles of self-preservation is not disputed. And this right is resolvable into the most absolute necessity; for, were the laws,dispensed with, wherever they happen to be in collision with some supposed religious obligation, government would be perpetually falling short of the exigence. There are few things, however simple, that stand indifferent in the view of all the sects into which the Christian world is divided. In the case before us, it is said the rights of conscience might have been, jeoparded by.placing the juror in the predicament of either violating his affirmation or doing' that for which his conscience informs him civil government has no warrant. Is not a witness who entertains the same scruples, exactly in the same predicament when compelled to testify to facts that may affect a prisoner’s life? Yet it would not be endured that a murderer should escape punishment because the witnesses have qualms of conscience. To say there is no reason why the conscience of the witness, who merely says the truth, should-be affected by consequences which are not of' his seeking,.is to say nothing. What more does the juror than say the truth, the consequences not being of his seeking? Guilt is a conclusion of law from facts rendered judicially certain; in the ascertainment of which, the witness who testifies, and the juror who pronounces on the credit of his veracity, are equally actors. But it is the law, and not the jury or the witnesses, that dooms the criminal to death. To go a step further. Would a sheriff who should entertain such scruples be excused from executing a criminal .capitally convicted ? No one pretends it. In the whole course of the prosecution, from its inception to its consummation, it is not easy to understand why the juror alone should be absolved from acting his part. There is a sect who deny the lawfulness of any government that is not founded exclusively. on the express word of God; and who, consequently, will not swear to support the state or federal constitution, or, in any way, mingle in civil affairs. Would a judge be justifiable in exempting one of these from the laws' which require the citizen to testify as a witness, serve as a juror or constable, and perform many other onérous services ? If he would, the militia laws which contain no exception in favour of the society of Friends, are a monstrous abuse of the powers delegated in the constitution.
The true question then is, whether error of judgment in respect of an abstract proposition, which is independent of the circum *162 stances of the prisoner’s ease, but which may affect it consequential^, be a ground-of challenge, for cause by the commonwealth.
' It is conceded that no alteration in this particular has hitherto been made in.the law; and it is therefore an extremely suspicious circumstance that the. books contain no instance of such a -challenge., The inference from this is not rebutted by'referring to the stat. 7 and 8 W. 3, c. 21, as having obviated all question on the subject in Erigland, by disabling Quakers from serving on juries. It is notorious that members of other religious .denominations deny the lawfulness of capital punishment. So prevalent was this opinion at one time, that the executive of Pennsylvania recommended the abolition of capital punishment altogether; and it is known that the measure had many friends in the legislature. But the truth is, this opinion is not held by the Society of Friends as a body; as I have heard a gentleman of that denomination, who honourably discharges a high -judicial trust, repeatedly declare. If tl)e crown had'all along a right to challenge for this cause, instances of the exercise of it must have occurred. Chief Justice Wray used to compare a case without a precedent to a bastard that, had no cousin, (3 Rep. 23, a.;) and Lord Coke'says: '.“ True it is that every precedent hath a commencement; but when authority and precedent are wanting, there is need of great consideration before that any .thing of novelty is established, and to provide that this be not against the law of the land.” (12 Rep. 74, b.) I consider the want of a precedent for such a challenge, as strong evidence of the law. • ’
If, then, the books do not furnish the very case, do they furnish a principle in- which it is embraced ?' Challenges to the polls for cause, are div.ided into such as are propter honoris respectum; propter defectum; propter affectum; and propter■ delictum; there is no possible' cause of challenge that may not be arranged under one of these heads. The first does not exist here, as the law acknowledges, no'dislinction of rank; ñor can the case be referred to the lastj as the objection does not impute criminality to the juror. Neither is it referrible to the second; for, according to Lord Coke, who is perhaps .the best authority on-the subject, there are but four causes of challenge propter defectum; to wit, alienage, villienage, insufficiency of freehold, and want of hundredors; under none of which can the cause of challenge here be- ranked. But it seems Lord .Coke -has also said,! — <e He that is of a jury must be liber homo; that is, not only a freeman and not bond, but also one that hath such freedom of mind that he stands indifferent, as he stands unsworn:” (I Inst. 155, a.;) that is, as I understand it, indifferent as to the parties; and the want.of such indifference is the ground work of every challenge propter affectum, whether principal or to the favour.' What does Lord Coke himself say? — “ A principal challenge is where there is express favour or express malice.” (1 InSt. 157, a.) And again: — “Challenge to the favour, when *163 either party cannot take any principal challenge, but showeth canses of favour which must be left to the conscience and discretion of the triors to find him favourable or not.” (1 Inst. 157, b.) Is this the language of a man who. is describing error of opinion ia respect of an abstract proposition ? Insanity might as well be alleged as a cause of challenge for favour. It is impossible not to see that Lord Cok® intended' to use the words malice .and favour in their natural sense, and not to signify a-constructive partiality which' should be consistent with absolute indifference to the parties personally;, and thus explained-, the freedom of mind of which he speaks, is plainly nothing else than exemption from the dominion of the passions. All the examples he has put,,are instances of favour or malice as regards the person. ‘ ¡
As far as authority is concerned, therefore, it is against the allowance'of the challenge. But the naked fact that no case of the sort has arisen in England or our sister states; or had arisen-in Pennsylvania previous to the entire abolition of peremptory challenges by the commonwealth, shows conclusively the nature of the mischief, and the. remedy for it at the common law. The fallacy of the ingenious argum.enf; of the attorney general, is in supposing that there could be no other remedy than a challenge for cause; and the effect was rendered the more imposing by putting the converse of the case-after the prisoner’s-peremptory challenges are spent. Twenty, peremptory challenges, if■ judiciously managed, are-sufficiept to obviate every disadvantage of the kind; and if the prisoner wastes them on frivolous objections, it is a misfortune against which the forecast of the.law cannot secure'him. But even should that occur, his situation would be no worse than if an enemy, known to be such only to himself, were to be called to the box after ail -his peremptory challenges had been spent. Such a case is within the range of possibility, but it is an insecure -foundation for an argument. But why should a prejudice on this head be alleged as a cause of challenge, more than an abstract prejudice arising from' divisions in religion or politics ? The Catholics have been accused of holding it meritorious to destroy a heretic; and .perhaps, if the account were fairly stated,, the Protestants would not.be much in their debt. It is certain that party prejudices, whether sectarian or political, are as'fierce, and operate as powerfully to pervert the understanding and bias the judgment, as prejudice in respect of abstract subjects. Yet no -one thinks'of a sectarian or a political opinion as a cause of challenge; but where the party thinks it will operate to his disadvantage, he sets the juror aside without assigning a cause.
If, then, mere error of opinion were not a cause of challenge before the abolition ofperemptory challenges by the-commonwealth, can we declare it to be so now? The abrogation of a privilege which had put the commonwealth barely on a footing with the prisoner, very satisfactorily indicates an intention to leave him in possession *164 of all adventitious-advantages. The inference of such an intention, is corroborated by -the acquiescence of the legislature in the construction. put on the act of assembly in The Commonwealth v. Allen. I do n'ot insist on the abstract'authority of that case; not because the decision is not full to the point, (for I perfectly remember that the whole ground was examined,) but because it was ruled in the hurry of a trial. But, although this occurred during a'session of the legislature; and became a subject of discussion in the newspapers,,it produced no new enactment. After this, it-seems to me, we cannot deprive a prisoner of the incidental advantages of the act of assembly by enlarging the bounds of the challenge for cause. We can have nothing to do with the unreasonableness Of this particular advantage. Our jurisprudence abounds with unreasonable advantages .enjoyed by the accused. The least slip in the indictment is fatal: a new'trial cannot be ■awarded after an acquittal produced by the most glaring misdirection; and the prisoner is to be acquitted wherever there is a reasonable dpubt of his guilt.. These, and many other unreasonable advántages, the law allows oii principles of humanity or policy; and, if the legislature, chooses to throw in the full and exclusive benefit of peremptory challenges, who can object ? No one is more thoroughly convinced of the'mischievous consequences of the act of assembly in practice, and the abstract propriety of the objection to the juror here; or is more desirous of seeing the common law remedy restored by the. proper authority. But feeling, as I do, a horror of judicial legislation, I would suffer any extremity of inconvenience'; rather than step beyond the legitimate province of the court, to touch even a hair of any privilege of a prisoner on trial for his life. That Chief Justice argued very ill, who, in a capital case, admitted a jury not freeholders, saying, — “ Why may not we make precedents to succeeding times, as well as those who have gone before us, have made precedents to us.” Such an occurrence in the trial of Algernon Sydney, is spoken of in terms of indignation, (Burnet’s own Times, Lond. Ed. 1724, vol. i. p. 570.) Were the judges to set the law to rights as often as it should differ from .their ideal standard of excellence, it is a hundred to one that their corrections would not hit’ the taste of those who came after them; and we should have nothing but corrections, while there would be no guide in the decision of-causes but the discretion of fallible judges in the court of the last resort, and no rule by which, the citizen might beforehand square his actions. il The discretion of a judge,” said one of the greatest constitutional lawyers that ever graced the English bench,* '‘- is the law of tyrants; it is always unknown: it is different in different men: it is casual and depends upon constitution, temper, and passion. In the best it is oftentimes caprice — in the worst, it is every vice, folly, and *165 passion to which human nature, can be liable.” I concede it to be one of the excellencies of the common law, that it'admits of perpetual improvement by accommodating itself to the circumstances of the age-. But every beneficial change has been by gradations so slow as to be absolutely insensible; and to-prevent even those by. whom it was wrought from being conscious of it. Lord Mansfield succeeded admirably where nothing was first to be pulled di>wn; but wherever the common law was. thrust.aside to make room for his improvements, its superiority has been vindicated by experience, and little now remains of all he built' up, except his commercial law and the expansion which-he gave to the action for money had and received. Every system of jurisprudence will necessarily be defective;' and if we interfere to remedy every insignificant defect, experience will assuredly convince the profession if not ourselves, that our reason is -no better than the reason of those who went before us.
Motion refused.

 Lord Camden.