PHILIPS and others, executors of SIMON, deceased, *against* GRATZ, and others, administrators of GRATZ.

An appeal lies from the Circuit, to the Supreme Court, on the refusal of the former to take off a *non suit*, entered by consent of plaintiff's attorney, his objections to a continuance having been over-ruled, and the cause ordered on to trial.

The conscientious scruples of a Jew to appear in court, and attend to the trial of his cause on Saturday, the Jewish Sabbath, is no ground for the continuance of his cause.

On a *tales de circumstantibus*, by-standers only or those actually present in court, can be selected and returned as jurors.

APPEAL from the Circuit Court.

This was an action of covenant pending in the Circuit Court, in the county of *Lancaster*. It came on for trial before Mr. *Justice Kennedy*, on Saturday, the 7th day of May, 1831. The counsel for the plaintiffs, moved a continuance of the cause, on the grounds that papers, without which they could not proceed, were at that time in possession of another jury who had retired to consider of their verdict, in a cause between the same parties: and on the deposition of *Levi Philips*, one of the plaintiffs, taken the same day in open court, stating "that he had scruples of conscience against appearing in court to-day, and attending to any secular business; and that he believes his presence and aid will be material in the progress of the cause." The defendant's counsel offered the

(Simon's executors *v.* Gratz.)

use of copies of the papers referred to, and insisted upon going on to trial. His honor over-ruled the objections of the plaintiff, and ordered on the cause.

The clerk proceeded to call a jury, and three jurors only answering, the panel being exhausted, the defendant's counsel prayed a *tales de circumstantibus,* which was awarded by the court; but there were not a sufficient number of *by-standers* in the court-house, to supply the *tales;* whereupon the plaintiff's counsel objected to the sheriff's summoning any person as a juror, who should not be found within the court-house; but the objection was overruled by the court, and the sheriff went out and brought in from different parts of the city, a competent number of jurors. The plaintiff's counsel then, without offering any testimony, took a *non suit;* and a motion to take off the *non suit* being over-ruled, they took an appeal to the Supreme Court.

*Norris* for the defendants,

Now moved to quash the appeal. He took a distinction between a *non pros,* which are the words used in the act of the 20th March, 1797, and a *non suit,* as taken by the plaintiffs' counsel in this case. He referred to *Virtue* v. *Patterson,* 17. *Serg. & Rawle,* 249.

*Champneys* for the appellants,

Contended the case fell within the express provisions of the act referred to, and was sustained by the decision in *Virtue* v. *Patterson.* The motion to quash was over-ruled by the court.

The errors assigned, upon which the appellants claimed to have the non suit taken off, were, 1st. That *Levi Philips* was the only plaintiff attending to the preparation of the cause, and that he could not appear in court on *Saturday,* when the case was ordered on, from conscientious scruples, as stated in his affidavit, that day being his *Sabbath,* according to his religious belief; and that the cause could not be tried without his assistance. 2d. That the original papers, on which the action was brought, and others were then out with another jury, in a cause between the same parties, that they could not be withdrawn, nor could they proceed upon copies as one of the issues was in the plea of *non est factum.* 3d. That the jury was improperly selected. That upon the *tales* awarded, the sheriff was directed by the court, although the plaintiff's counsel objected, to go out of the court-house to make the selection, and that he accordingly went out and made a selection of persons from different parts of the city.

*Champneys* for the appellant,

Contended that the religious observance of that day as the *Sabbath*, was with Mr. *Philips,* a matter of conscience, which "no human authority can in any case, whatever, control or interfere with," and "that no preference shall ever be given by law to any religious establishments, or modes of worship." *Cons. Penn. art.* ix. § iii, and that like indemnity and protection are found in the Constitution of the United States, amend. section iii, "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." It is in vain to say, that "we have guaranteed to us the rights of conscience," and that "no preference" shall ever be given to one creed over another, if we derive no practical benefits from it.    If courts are so constructed by law, and justice so administered as to take from a party, either his conscience, or his estate, a most direct and injurious "perference" in such cases is manifestly given. In the case of *Stansberry* v. *Marks,* 2 *Dall.* 213, a fine was imposed upon a *Jew* for refusing to be sworn as a witness, on his Sabbath; the case was not argued, and the question was partially waived, by the party agreeing to dispense with his testimony; this case, therefore, cannot be considered as authority.    Christianity and conscience are parts of the common law of Pennsylvania, but the Jew is alike protected in his religious belief with the Christian. *Updegraff* v. *The Commonwealth,* 11 *Serg. & Rawle,* 408.    The obligation imposed upon Jews to abstain from labor on the Christian Sabbath, raises no implication that the law will not protect him in the observance of his own. *Commonwealth* v. *Wolf,* 3 *Serg. & Rawle,* 50. 'It was decided in New York, that a Catholic priest, who received the confession of a parishioner, could not be compelled to disclose upon oath, the matters thus committed to him, under the convictions of a religious duty. Report of the case by *Sampson. The Commonwealth* v. *Philips,* pages 91, 97, 104, 108, 113. Congress, and public opinion, in reference to the Sunday mails, have recently passed upon this subject very emphatically.    On the 2d exception, he argued the impracticability of going on without the papers.    That they were not in the power of the party, not by his own act, but the act of the law, and the disadvantage of using copies, if they could be procured, he said was manifest.    On the 3d exception: the acts of assembly contain an entire and perfect system for selecting and returning jurors.    They evince a uniform object and design throughout; that is, the securing of entire impartiality. Nothing is left to the discretion of the sheriff, that can be avoided. See 4 *Smith's Laws,* 237.    Where a sufficient number of regular jurors do not answer, the deficiency is to be made up of "qualified

by-standers," who shall be "immediately," summoned, &c.    In England, they are in such cases, to be taken *"de circumstantibus,"* from the *by-standers,* persons present: not out of the court-house, or any where in the city or county.    The term is a technical one, and has a fixed and precise acceptation, and the practice has been always conformable to its apparent meaning.    See 1 *Penn. Prac.* 193. 3 *Bla. Com.* 365.   6 *Jac. Law. Dic.* 172.   2 *Saund. Rep.* 348, note 1.

*Montgomery* and *Norris* for the appellee,

Denied that the rights of conscience, as contemplated in the constitution of the state, or of the United States, had been violated in this case.   There was no coercion to change his faith, or to alter his practice in pursuance of it.   His religious observances have been in no way invaded.   The law recognizes but one day in seven, in which the community is exempted from secular affairs, but different sects and denominations may establish many more.   And if the protection claimed in this case, was extended to all, we would not have a juridical day in the week.   The faith and religious worship of individuals is protected, but the decision in this case, affected merely a civil right, in the performance of a civil duty.

The point seems to have been settled in the cases referred to in 2 *Dall.,* and in 11 *Serg. & Rawle.*   But the plaintiff waived his objection in this case, by actually coming into court, and being sworn to the affidavit exhibited.   Having voluntarily attended to the case, so far as advanced his own interests, he could not refuse further to attend, so as to prejudice those of his opponents: at all events, his presence was not necessary.   Every thing could have been done by attorney.   The court might have justly concluded the object was delay.   On the 2d point, it was said, that the plea of *non est factum,* did not deny the execution of the paper, but was designed to bring into adjudication its legal operation: an offer was made to procure copies, and the original papers were subject to the control of the court, so that no injustice could have been done.   As to the 3d exception, the object of the acts of assembly for selecting jurors, was to avoid collusion and fraud; but in cases where the powers of the sheriff are executed *immediately,* and under the control of the court, there is no danger of either.   If the word "by-standers," is confined to persons within the courthouse, the right would generally be without any practical use, for competent jurors could not often be had, or the friends of parties would frequently be taken, who were brought there by interested feelings, or by design.   The argument *ab inconvenienti,* is par-

ticularly applicable. The language of the statute, *Henry* 8, chap. 65, in defining the persons to be selected, refers to those, "then present at the assizes." The ground for selection is not narrowed down to the court-house floor; and by the letter and the spirit of the act of 17th March, 1795, 2 *Penn. Law. Dall. edition*, 262, the sheriff has his bailiwick, within which to make his selection. In 2 *Tid. Prac.* 783, the practice is said to be, to take the *tales,* from remaining jurors, belonging to other causes. The act of 1805, in directing them to be taken from "by-standers," was not designed to change the previous law; the term includes those round and about, as well as those present.

*Champneys* in reply,

Contended that the case in 3 *Serg. & Rawle,* 50, sustained his view under the first point, and that our civil conduct, and social relations often grow out of our religious persuasions, and that the peculiar faith is violated, where the practices necessarily growing out of it, are disregarded. On the 2d point, they could not accept copies, which they had not compared, and which they did not know to be accurate. And under the plea of *non est factum,* they could not move without the original covenant. On the 3d point, he contended that the uniform practice had been, not to go out of the court-house, to search for "by-standers," and that the words of the British statute, "those present at the assizes, or *nisi prius,*" did not extend throughout the bailiwick, but clearly referred to persons then present. By-standers, in our act of assembly, distinctly designates persons standing around in the court-house, and not round the county. No process issues, and there is no mode of compelling any one absent to attend. Yet if summoned in presence of the court, they could be compelled to serve. The argument *ab inconvenienti,* only applies in doubtful cases. This is a plain case, and under the ordinary practice, no difficulties occur.

The opinion of the court was delivered by

GIBSON, C. J.—The religious scruples of persons concerned with the administration of justice, will receive all the indulgence that is compatible with the business of government; and had circumstances permitted it, this cause would not have been ordered for trial on the Jewish Sabbath. But when a continuance for conscience' sake, is claimed as a right, and at the expense of a term's delay, the matter assumes a different aspect.

It never has been held except in a single instance, that the course of justice may be obstructed by any scruple or obligation whatever. The sacrifice that ensues from an opposition of conscientious

(Simon's executors *v.* Gratz.)

objection to the performance of a civil duty, ought, one would think, to be on the part of him whose moral or religious idiosincrasy, makes it necessary; else a denial of the lawfulness of capital punishment would exempt a witness from testifying to facts that might serve to convict a prisoner of murder, or to say nothing of the other functionaries of the law, excuse the sheriff, for refusing to execute one capitally convicted. That is an exemption which none would pretend to claim; yet it would inevitably follow from the principle insisted on here. Indeed a more apposite instance of conflict betwixt religious obligation and social duty, can hardly be imagined. Rightly considered, there are no duties half so sacred as those which the citizen owes to the laws. In the judicial investigation of facts, the secrets of no man will be wantonly exposed, nor will his principles be wantonly violated; but a respect for these must not be suffered to interfere with the operations of that organ of the government which has more immediately to do with the protection of person and property: the safety of the citizen, and the very existence of society require that it should not. That every other obligation shall yield to that of the laws, as to a superior moral force, is a tacit condition of membership in every society, whether lay or secular, temporal or spiritual, because no citizen can lawfully hold communion with those who have associated on any other terms; and this ought, in all cases of collision, to be accounted a sufficient dispensation to the conscience. I therefore entirely dissent from the opinion of the Mayor's Court of *New York,* in the case which has been cited. No one is more sensible than I, of the benefit derived by society from the offices of the Catholic clergy, or of the policy of protecting the secrets of auricular confession. But considerations of policy address themselves with propriety to the legislature, and not to a magistrate whose course is prescribed not by discretion, but rules already established. On this subject, I expressed my sentiments somewhat more at large in *Lesher.* v. *The Commonwealth,* 17 *Serg. & Rawle,* 160, and I am for setting aside this non-suit, certainly not for any supposed interference with the rights of conscience.

As regards the remaining points, it is unnecessary to determine whether papers in the actual custody of a jury, retired to consider of its verdict, are sufficiently in the power of the party to enable him to go to trial safely in another action, because it seems clear, that the plaintiff was not bound to go before the jurors returned on the *tales.* Our act of assembly requires tales-men to be taken from the by-standers; and in this respect it is more explicit than the English statute, which directs them to be taken from *the persons attending at the assizes.* Yet the construction of the one, and the other, has never been so liberal as to include any but those

ʳ (Simon's executors *v.* Gratz.)

actually present in court; and hence perhaps it is, that a writ for a *tales*, which would seem necessary, were the delegated powers of the court to be exercised out of its immediate presence, is in fact never issued; and it is not easy to say how the sheriff could compel the attendance of persons picked up in the streets, without it. The practice of selection by the sheriff, except in this particular emergency, has been abolished by the legislature; but the old abuses, if any there were, would soon recur, were the power by a *tales* to be exercised in any other way than under the immediate supervision of the judges.   Difficulties may sometimes occur, for want of by-standers; but it is safer to abide by a settled construction even at the expense of convenience, than to introduce a remedy at the expense of uniformity of practice.   The cause is therefore to be restored to the trial list.

ROGERS, J.—Having been of counsel in the case, and ROSS, J. not having heard the argument, took no part in the decision.

Non-suit set aside, and the case remitted to the Circuit Court.

———✦———

*The following rule for the Lancaster District, was adopted by the court at this term:*

JUNE 3d, 1831, Ordered by the court, that each Friday, shall be assigned for hearing all motions which shall be regularly put on the motion list, and for cases of distribution of money in court, and cases that may require *festinum remedium;* provided, that a preference be claimed on the first day of the period, and that paperbooks be furnished in all cases, and notice in writing be given to the opposite party.

END OF MAY TERM, 1831—LANCASTER DISTRICT.