# CITY OF BOERNE *v.* FLORES, ARCHBISHOP OF SAN ANTONIO, ET AL.

No. 95–2074. Argued February 19, 1997—Decided June 25, 1997

508

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, THOMAS, and GINSBURG, JJ., joined, and in which SCALIA, J., joined as to all but Part III–A–1. STEVENS, J., filed a concurring opinion, *post*, p. 536. SCALIA, J., filed an opinion concurring in part, in which STEVENS, J., joined, *post*, p. 537. O'CONNOR, J., filed a dissenting opinion, in which BREYER, J., joined except as to the first paragraph of Part I, *post*, p. 544. SOUTER, J., *post*, p. 565, and BREYER, J., *post*, p. 566, filed dissenting opinions.

*Marci A. Hamilton* argued the cause for petitioner. With her on the briefs were *Lowell F. Denton* and *Gordon L. Hollon.*

*Jeffrey S. Sutton,* State Solicitor of Ohio, argued the cause for the State of Ohio et al. as *amici curiae* urging reversal. With him on the brief were *Betty D. Montgomery,* Attor-

ney General of Ohio, *Robert C. Maier* and *Todd Marti*, Assistant Attorneys General, and the Attorneys General for their respective jurisdictions as follows: *Malaetasi M. Togafau* of American Samoa, *Grant Woods* of Arizona, *Gale A. Norton* of Colorado, *M. Jane Brady* of Delaware, *Robert Butterworth* of Florida, *Calvin Holloway, Sr.,* of Guam, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Mike Moore* of Mississippi, *Frankie Sue Del Papa* of Nevada, *Jeffrey R. Howard* of New Hampshire, *Michael F. Easley* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Thomas W. Corbett, Jr.,* of Pennsylvania, and *Julio A. Brady* of the Virgin Islands.

*Douglas Laycock* argued the cause for respondent Flores. With him on the brief were *Thomas Drought* and *Patricia J. Schofield. Acting Solicitor General Dellinger* argued the cause for the United States. With him on the brief were *Assistant Attorney General Hunger, Deputy Solicitor General Waxman, Patricia A. Millett,* and *Michael Jay Singer.**

---

*Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Virginia by *James S. Gilmore II,* Attorney General, *David E. Anderson,* Chief Deputy Attorney General, *William Henry Hurd,* Deputy Attorney General, and *Lee E. Goodman;* for the Clarendon Foundation by *Ronald D. Maines* and *Jay S. Bybee;* for the National Right to Work Legal Defense Foundation, Inc., by *Bruce N. Cameron;* and for the San Antonio Conservation Society et al. by *Robert A. Long, Jr.,* and *Ivan K. Fong.*

Briefs of *amici curiae* urging affirmance were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Jack Schwartz* and *Steven M. Sullivan,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Richard Blumenthal* of Connecticut, *Scott Harshbarger* of Massachusetts, and *Dennis C. Vacco* of New York; for members of the Virginia House of Delegates et al. by *Mitchell A. Karlan;* for Senator Orrin G. Hatch et al. by *Carter G. Phillips* and *Gene C. Schaerr;* for Senator Edward M. Kennedy et al. by *Clifford M. Sloan;* for the American Bar Association by *N. Lee Cooper, Stuart H. Newberger,* and *Joseph N. Onek;* for the American Center for Law and Justice by *Jay Alan Sekulow, James M. Henderson, Sr., Walter M. Weber, Keith A. Fournier,* and *John G. Stepanovich;* for the Beckett Fund for Religious Liberty by *Kevin J. Hasson;* for the Church of Jesus

JUSTICE KENNEDY delivered the opinion of the Court.*

A decision by local zoning authorities to deny a church a building permit was challenged under the Religious Freedom Restoration Act of 1993 (RFRA or Act), 107 Stat. 1488, 42 U. S. C. § 2000bb *et seq.* The case calls into question the authority of Congress to enact RFRA. We conclude the statute exceeds Congress' power.

## I

Situated on a hill in the city of Boerne, Texas, some 28 miles northwest of San Antonio, is St. Peter Catholic Church. Built in 1923, the church's structure replicates the mission

Christ of Latter-day Saints by *W. Cole Durham, Jr., James A. Serritella, James C. Geoly, Kevin R. Gustafson,* and *Von G. Keetch;* for the Coalition for the Free Exercise of Religion by *Marc D. Stern, Oliver S. Thomas, J. Brent Walker, Melissa Rogers, Steven T. McFarland, Samuel Rabinove, Richard Foltin, David Zwiebel, Steven R. Shapiro, Steven K. Green,* and *Jack F. Trope;* for the Defenders of Property Rights et al. by *Nancie G. Marzulla;* for the Minnesota Family Council et al. by *Jordan W. Lorence;* for the NAACP Legal Defense and Educational Fund, Inc., by *Elaine R. Jones, Theodore M. Shaw,* and *Norman J. Chachkin;* for the National Committee for Amish Religious Freedom by *William Bentley Ball* and *Richard E. Connell;* for the National Jewish Commission on Law and Public Affairs by *Nathan Lewin, Mathew S. Nosanchuk,* and *Dennis Rapps;* for the National Trust for Historic Preservation in the United States by *John H. Beisner* and *Elizabeth S. Merritt;* for the Prison Fellowship Ministries et al. by *Michael Joseph Woodruff, Scott J. Ward, J. Matthew Szymanski, Stephen M. Clarke,* and *Isaac M. Jaroslawicz;* and for the United States Catholic Conference et al. by *Michael W. McConnell, Mark E. Chopko,* and *Jeffrey Hunter Moon.*

Briefs of *amici curiae* were filed for the State of Texas by *Dan Morales,* Attorney General, *Jorge Vega,* First Assistant Attorney General, and *Samuel W. Goodhope* and *Javier Aguilar,* Special Assistant Attorneys General; for the Center for the Community Interest by *Gilbert R. Serota;* for Children's Healthcare is a Legal Duty, Inc., et al. by *Robert J. Bruno;* for the Knights of Columbus by *Thomas D. Yannucci* and *Carl A. Anderson;* for the Rutherford Institute by *John W. Whitehead, James A. Hayes, Jr.,* and *Brian L. Day;* and by *Thurston Greene, pro se.*

*JUSTICE SCALIA joins all but Part III–A–1 of this opinion.

style of the region's earlier history. The church seats about 230 worshippers, a number too small for its growing parish. Some 40 to 60 parishioners cannot be accommodated at some Sunday masses. In order to meet the needs of the congregation the Archbishop of San Antonio gave permission to the parish to plan alterations to enlarge the building.

A few months later, the Boerne City Council passed an ordinance authorizing the city's Historic Landmark Commission to prepare a preservation plan with proposed historic landmarks and districts. Under the ordinance, the commission must preapprove construction affecting historic landmarks or buildings in a historic district.

Soon afterwards, the Archbishop applied for a building permit so construction to enlarge the church could proceed. City authorities, relying on the ordinance and the designation of a historic district (which, they argued, included the church), denied the application. The Archbishop brought this suit challenging the permit denial in the United States District Court for the Western District of Texas. 877 F. Supp. 355 (1995).

The complaint contained various claims, but to this point the litigation has centered on RFRA and the question of its constitutionality. The Archbishop relied upon RFRA as one basis for relief from the refusal to issue the permit. The District Court concluded that by enacting RFRA Congress exceeded the scope of its enforcement power under § 5 of the Fourteenth Amendment. The court certified its order for interlocutory appeal and the Fifth Circuit reversed, finding RFRA to be constitutional. 73 F. 3d 1352 (1996). We granted certiorari, 519 U. S. 926 (1996), and now reverse.

II

Congress enacted RFRA in direct response to the Court's decision in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990). There we considered a Free Exercise Clause claim brought by members of the

Native American Church who were denied unemployment benefits when they lost their jobs because they had used peyote. Their practice was to ingest peyote for sacramental purposes, and they challenged an Oregon statute of general applicability which made use of the drug criminal. In evaluating the claim, we declined to apply the balancing test set forth in *Sherbert* v. *Verner*, 374 U. S. 398 (1963), under which we would have asked whether Oregon's prohibition substantially burdened a religious practice and, if it did, whether the burden was justified by a compelling government interest. We stated:

> "[G]overnment's ability to enforce generally applicable prohibitions of socially harmful conduct . . . cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development. To make an individual's obligation to obey such a law contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling' . . . contradicts both constitutional tradition and common sense." 494 U. S., at 885 (internal quotation marks and citations omitted).

The application of the *Sherbert* test, the *Smith* decision explained, would have produced an anomaly in the law, a constitutional right to ignore neutral laws of general applicability. The anomaly would have been accentuated, the Court reasoned, by the difficulty of determining whether a particular practice was central to an individual's religion. We explained, moreover, that it "is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." 494 U. S., at 887 (internal quotation marks and citation omitted).

The only instances where a neutral, generally applicable law had failed to pass constitutional muster, the *Smith* Court

noted, were cases in which other constitutional protections were at stake. *Id.*, at 881–882. In *Wisconsin v. Yoder,* 406 U. S. 205 (1972), for example, we invalidated Wisconsin's mandatory school-attendance law as applied to Amish parents who refused on religious grounds to send their children to school. That case implicated not only the right to the free exercise of religion but also the right of parents to control their children's education.

The *Smith* decision acknowledged the Court had employed the *Sherbert* test in considering free exercise challenges to state unemployment compensation rules on three occasions where the balance had tipped in favor of the individual. See *Sherbert, supra; Thomas v. Review Bd. of Indiana Employment Security Div.,* 450 U. S. 707 (1981); *Hobbie v. Unemployment Appeals Comm'n of Fla.,* 480 U. S. 136 (1987). Those cases, the Court explained, stand for "the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason." 494 U. S., at 884 (internal quotation marks omitted). By contrast, where a general prohibition, such as Oregon's, is at issue, "the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the test inapplicable to [free exercise] challenges." *Id.*, at 885. *Smith* held that neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.

Four Members of the Court disagreed. They argued the law placed a substantial burden on the Native American Church members so that it could be upheld only if the law served a compelling state interest and was narrowly tailored to achieve that end. *Id.*, at 894. JUSTICE O'CONNOR concluded Oregon had satisfied the test, while Justice Blackmun, joined by Justice Brennan and Justice Marshall, could see no compelling interest justifying the law's application to the members.

These points of constitutional interpretation were debated by Members of Congress in hearings and floor debates. Many criticized the Court's reasoning, and this disagreement resulted in the passage of RFRA. Congress announced:

"(1) [T]he framers of the Constitution, recognizing free exercise of religion as an unalienable right, secured its protection in the First Amendment to the Constitution;

"(2) laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise;

"(3) governments should not substantially burden religious exercise without compelling justification;

"(4) in Employment Division v. Smith, 494 U. S. 872 (1990), the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion; and

"(5) the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." 42 U. S. C. § 2000bb(a).

The Act's stated purposes are:

"(1) to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U. S. 398 (1963) and Wisconsin v. Yoder, 406 U. S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

"(2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government." § 2000bb(b).

RFRA prohibits "[g]overnment" from "substantially burden[ing]" a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden "(1) is in furtherance of

a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000bb–1. The Act's mandate applies to any "branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States," as well as to any "State, or . . . subdivision of a State." § 2000bb–2(1). The Act's universal coverage is confirmed in § 2000bb–3(a), under which RFRA "applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after [RFRA's enactment]." In accordance with RFRA's usage of the term, we shall use "state law" to include local and municipal ordinances.

### III

#### A

Under our Constitution, the Federal Government is one of enumerated powers. *McCulloch* v. *Maryland,* 4 Wheat. 316, 405 (1819); see also The Federalist No. 45, p. 292 (C. Rossiter ed. 1961) (J. Madison). The judicial authority to determine the constitutionality of laws, in cases and controversies, is based on the premise that the "powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury* v. *Madison,* 1 Cranch 137, 176 (1803).

Congress relied on its Fourteenth Amendment enforcement power in enacting the most far-reaching and substantial of RFRA's provisions, those which impose its requirements on the States. See Religious Freedom Restoration Act of 1993, S. Rep. No. 103–111, pp. 13–14 (1993) (Senate Report); H. R. Rep. No. 103–88, p. 9 (1993) (House Report). The Fourteenth Amendment provides, in relevant part:

"Section 1. . . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due proc-

ess of law; nor deny to any person within its jurisdiction the equal protection of the laws.

.        .        .        .        .

"Section 5.   The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

The parties disagree over whether RFRA is a proper exercise of Congress' §5 power "to enforce" by "appropriate legislation" the constitutional guarantee that no State shall deprive any person of "life, liberty, or property, without due process of law," nor deny any person "equal protection of the laws."

In defense of the Act, respondent the Archbishop contends, with support from the United States, that RFRA is permissible enforcement legislation. Congress, it is said, is only protecting by legislation one of the liberties guaranteed by the Fourteenth Amendment's Due Process Clause, the free exercise of religion, beyond what is necessary under *Smith*. It is said the congressional decision to dispense with proof of deliberate or overt discrimination and instead concentrate on a law's effects accords with the settled understanding that §5 includes the power to enact legislation designed to prevent, as well as remedy, constitutional violations. It is further contended that Congress' §5 power is not limited to remedial or preventive legislation.

All must acknowledge that §5 is "a positive grant of legislative power" to Congress, *Katzenbach* v. *Morgan*, 384 U. S. 641, 651 (1966). In *Ex parte Virginia*, 100 U. S. 339, 345–346 (1880), we explained the scope of Congress' §5 power in the following broad terms:

> "Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not

prohibited, is brought within the domain of congressional power."

Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into "legislative spheres of autonomy previously reserved to the States." *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 455 (1976). For example, the Court upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment, see U. S. Const., Amdt. 15, § 2, as a measure to combat racial discrimination in voting, *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308 (1966), despite the facial constitutionality of the tests under *Lassiter* v. *Northampton County Bd. of Elections*, 360 U. S. 45 (1959). We have also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States. *South Carolina* v. *Katzenbach, supra* (upholding several provisions of the Voting Rights Act of 1965); *Katzenbach* v. *Morgan, supra* (upholding ban on literacy tests that prohibited certain people schooled in Puerto Rico from voting); *Oregon* v. *Mitchell*, 400 U. S. 112 (1970) (upholding 5-year nationwide ban on literacy tests and similar voting requirements for registering to vote); *City of Rome* v. *United States*, 446 U. S. 156, 161 (1980) (upholding 7-year extension of the Voting Rights Act's requirement that certain jurisdictions preclear any change to a " 'standard, practice, or procedure with respect to voting' "); see also *James Everard's Breweries* v. *Day*, 265 U. S. 545 (1924) (upholding ban on medical prescription of intoxicating malt liquors as appropriate to enforce Eighteenth Amendment ban on manufacture, sale, or transportation of intoxicating liquors for beverage purposes).

It is also true, however, that "[a]s broad as the congressional enforcement power is, it is not unlimited." *Oregon* v.

*Mitchell, supra,* at 128 (opinion of Black, J.). In assessing the breadth of § 5's enforcement power, we begin with its text. Congress has been given the power "to enforce" the "provisions of this article." We agree with respondent, of course, that Congress can enact legislation under § 5 enforcing the constitutional right to the free exercise of religion. The "provisions of this article," to which § 5 refers, include the Due Process Clause of the Fourteenth Amendment. Congress' power to enforce the Free Exercise Clause follows from our holding in *Cantwell* v. *Connecticut,* 310 U. S. 296, 303 (1940), that the "fundamental concept of liberty embodied in [the Fourteenth Amendment's Due Process Clause] embraces the liberties guaranteed by the First Amendment." See also *United States* v. *Price,* 383 U. S. 787, 789 (1966) (there is "no doubt of the power of Congress to enforce by appropriate criminal sanction every right guaranteed by the Due Process Clause of the Fourteenth Amendment" (internal quotation marks and citation omitted)).

Congress' power under § 5, however, extends only to "enforc[ing]" the provisions of the Fourteenth Amendment. The Court has described this power as "remedial," *South Carolina* v. *Katzenbach, supra,* at 326. The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is. It has been given the power "to enforce," not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the "provisions of [the Fourteenth Amendment]."

While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and

Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect. History and our case law support drawing the distinction, one apparent from the text of the Amendment.

1

The Fourteenth Amendment's history confirms the remedial, rather than substantive, nature of the Enforcement Clause. The Joint Committee on Reconstruction of the 39th Congress began drafting what would become the Fourteenth Amendment in January 1866. The objections to the Committee's first draft of the Amendment, and the rejection of the draft, have a direct bearing on the central issue of defining Congress' enforcement power. In February, Republican Representative John Bingham of Ohio reported the following draft Amendment to the House of Representatives on behalf of the Joint Committee:

> "The Congress shall have power to make all laws which shall be necessary and proper to secure to the citizens of each State all privileges and immunities of citizens in the several States, and to all persons in the several States equal protection in the rights of life, liberty, and property." Cong. Globe, 39th Cong., 1st Sess., 1034 (1866).

The proposal encountered immediate opposition, which continued through three days of debate. Members of Congress from across the political spectrum criticized the Amendment, and the criticisms had a common theme: The proposed Amendment gave Congress too much legislative power at the expense of the existing constitutional structure. E. g., id., at 1063–1065 (statement of Rep. Hale); id., at 1082

(statement of Sen. Stewart); *id.*, at 1095 (statement of Rep. Hotchkiss); *id.*, at App. 133–135 (statement of Rep. Rogers). Democrats and conservative Republicans argued that the proposed Amendment would give Congress a power to intrude into traditional areas of state responsibility, a power inconsistent with the federal design central to the Constitution. Typifying these views, Republican Representative Robert Hale of New York labeled the Amendment "an utter departure from every principle ever dreamed of by the men who framed our Constitution," *id.*, at 1063, and warned that under it "all State legislation, in its codes of civil and criminal jurisprudence and procedure . . . may be overridden, may be repealed or abolished, and the law of Congress established instead." *Ibid.* Senator William Stewart of Nevada likewise stated the Amendment would permit "Congress to legislate fully upon all subjects affecting life, liberty, and property," such that "there would not be much left for the State Legislatures," and would thereby "work an entire change in our form of government." *Id.*, at 1082; accord, *id.*, at 1087 (statement of Rep. Davis); *id.*, at App. 133 (statement of Rep. Rogers). Some radicals, like their brethren "unwilling that Congress shall have any such power . . . to establish uniform laws throughout the United States upon . . . the protection of life, liberty, and property," *id.*, at 1095 (statement of Rep. Hotchkiss), also objected that giving Congress primary responsibility for enforcing legal equality would place power in the hands of changing congressional majorities, *ibid.* See generally Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1, 57 (1955); Graham, Our "Declaratory" Fourteenth Amendment, 7 Stan. L. Rev. 3, 21 (1954).

As a result of these objections having been expressed from so many different quarters, the House voted to table the proposal until April. See, *e. g.*, B. Kendrick, Journal of the Joint Committee of Fifteen on Reconstruction 215, 217 (1914); Cong. Globe, 42d Cong., 1st Sess., App. 115 (1871) (statement

of Rep. Farnsworth). The congressional action was seen as marking the defeat of the proposal. See The Nation, Mar. 8, 1866, p. 291 ("The postponement of the amendment . . . is conclusive against the passage of [it]"); New York Times, Mar. 1, 1866, p. 4 ("It is doubtful if this ever comes before the House again . . ."); see also Cong. Globe, 42d Cong., 1st Sess., at App. 115 (statement of Rep. Farnsworth) (The Amendment was "given its quietus by a postponement for two months, where it slept the sleep that knows no waking"). The measure was defeated "chiefly because many members of the legal profession s[aw] in [it] . . . a dangerous centralization of power," The Nation, *supra*, at 291, and "many leading Republicans of th[e] House [of Representatives] would not consent to so radical a change in the Constitution," Cong. Globe, 42d Cong., 1st Sess., at App. 151 (statement of Rep. Garfield). The Amendment in its early form was not again considered. Instead, the Joint Committee began drafting a new article of Amendment, which it reported to Congress on April 30, 1866.

Section 1 of the new draft Amendment imposed self-executing limits on the States. Section 5 prescribed that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article." See Cong. Globe, 39th Cong., 1st Sess., at 2286. Under the revised Amendment, Congress' power was no longer plenary but remedial. Congress was granted the power to make the substantive constitutional prohibitions against the States effective. Representative Bingham said the new draft would give Congress "the power . . . to protect by national law the privileges and immunities of all the citizens of the Republic . . . whenever the same shall be abridged or denied by the unconstitutional acts of any State." *Id.*, at 2542. Representative Stevens described the new draft Amendment as "allow[ing] Congress to correct the unjust legislation of the States." *Id.*, at 2459. See also *id.*, at 2768 (statement of Sen. Howard) (§ 5 "enables Congress, in case the States shall enact

laws in conflict with the principles of the amendment, to correct that legislation by a formal congressional enactment"). See generally H. Brannon, The Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States 387 (1901) (Congress' "powers are only prohibitive, corrective, vetoing, aimed only at undue process of law"); *id.*, at 420, 452–455 (same); T. Cooley, Constitutional Limitations 294, n. 1 (2d ed. 1871) ("This amendment of the Constitution does not concentrate power in the general government for any purpose of police government within the States; its object is to preclude legislation by any State which shall 'abridge the privileges or immunities of citizens of the United States' "). The revised Amendment proposal did not raise the concerns expressed earlier regarding broad congressional power to prescribe uniform national laws with respect to life, liberty, and property. See, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., at App. 151 (statement of Rep. Garfield) ("The [Fourteenth Amendment] limited but did not oust the jurisdiction of the State[s]"). After revisions not relevant here, the new measure passed both Houses and was ratified in July 1868 as the Fourteenth Amendment.

The significance of the defeat of the Bingham proposal was apparent even then. During the debates over the Ku Klux Klan Act only a few years after the Amendment's ratification, Representative James Garfield argued there were limits on Congress' enforcement power, saying "unless we ignore both the history and the language of these clauses we cannot, by any reasonable interpretation, give to [§ 5] . . . the force and effect of the rejected [Bingham] clause." *Ibid.*; see also *id.*, at App. 115–116 (statement of Rep. Farnsworth). Scholars of successive generations have agreed with this assessment. See H. Flack, The Adoption of the Fourteenth Amendment 64 (1908); Bickel, The Voting Rights Cases, 1966 S. Ct. Rev. 79, 97.

The design of the Fourteenth Amendment has proved significant also in maintaining the traditional separation of pow-

ers between Congress and the Judiciary. The first eight Amendments to the Constitution set forth self-executing prohibitions on governmental action, and this Court has had primary authority to interpret those prohibitions. The Bingham draft, some thought, departed from that tradition by vesting in Congress primary power to interpret and elaborate on the meaning of the new Amendment through legislation. Under it, "Congress, and not the courts, was to judge whether or not any of the privileges or immunities were not secured to citizens in the several States." Flack, *supra*, at 64. While this separation-of-powers aspect did not occasion the widespread resistance which was caused by the proposal's threat to the federal balance, it nonetheless attracted the attention of various Members. See Cong. Globe, 39th Cong., 1st Sess., at 1064 (statement of Rep. Hale) (noting that Bill of Rights, unlike the Bingham proposal, "provide[s] safeguards to be enforced by the courts, and not to be exercised by the Legislature"); *id.*, at App. 133 (statement of Rep. Rogers) (prior to Bingham proposal it "was left entirely for the courts . . . to enforce the privileges and immunities of the citizens"). As enacted, the Fourteenth Amendment confers substantive rights against the States which, like the provisions of the Bill of Rights, are self-executing. Cf. *South Carolina* v. *Katzenbach*, 383 U. S., at 325 (discussing Fifteenth Amendment). The power to interpret the Constitution in a case or controversy remains in the Judiciary.

2

The remedial and preventive nature of Congress' enforcement power, and the limitation inherent in the power, were confirmed in our earliest cases on the Fourteenth Amendment. In the *Civil Rights Cases*, 109 U. S. 3 (1883), the Court invalidated sections of the Civil Rights Act of 1875 which prescribed criminal penalties for denying to any person "the full enjoyment of" public accommodations and conveyances, on the grounds that it exceeded Congress' power

by seeking to regulate private conduct. The Enforcement Clause, the Court said, did not authorize Congress to pass "general legislation upon the rights of the citizen, but corrective legislation, that is, such as may be necessary and proper for counteracting such laws as the States may adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing . . . ." *Id.*, at 13–14. The power to "legislate generally upon" life, liberty, and property, as opposed to the "power to provide modes of redress" against offensive state action, was "repugnant" to the Constitution. *Id.*, at 15. See also *United States* v. *Reese*, 92 U. S. 214, 218 (1876); *United States* v. *Harris*, 106 U. S. 629, 639 (1883); *James* v. *Bowman*, 190 U. S. 127, 139 (1903). Although the specific holdings of these early cases might have been superseded or modified, see, *e. g.*, *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241 (1964); *United States* v. *Guest*, 383 U. S. 745 (1966), their treatment of Congress' § 5 power as corrective or preventive, not definitional, has not been questioned.

Recent cases have continued to revolve around the question whether § 5 legislation can be considered remedial. In *South Carolina* v. *Katzenbach, supra,* we emphasized that "[t]he constitutional propriety of [legislation adopted under the Enforcement Clause] must be judged with reference to the historical experience . . . it reflects." 383 U. S., at 308. There we upheld various provisions of the Voting Rights Act of 1965, finding them to be "remedies aimed at areas where voting discrimination has been most flagrant," *id.*, at 315, and necessary to "banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century," *id.*, at 308. We noted evidence in the record reflecting the subsisting and pervasive discriminatory—and therefore unconstitutional—use of literacy tests. *Id.*, at 333–334. The Act's new remedies, which used the administrative resources of the Federal Government, included the suspension of both literacy tests and,

pending federal review, all new voting regulations in covered jurisdictions, as well as the assignment of federal examiners to list qualified applicants enabling those listed to vote. The new, unprecedented remedies were deemed necessary given the ineffectiveness of the existing voting rights laws, see *id.*, at 313–315, and the slow, costly character of case-by-case litigation, *id.*, at 328.

After *South Carolina* v. *Katzenbach*, the Court continued to acknowledge the necessity of using strong remedial and preventive measures to respond to the widespread and persisting deprivation of constitutional rights resulting from this country's history of racial discrimination. See *Oregon* v. *Mitchell*, 400 U. S., at 132 ("In enacting the literacy test ban . . . Congress had before it a long history of the discriminatory use of literacy tests to disfranchise voters on account of their race") (opinion of Black, J.); *id.*, at 147 (Literacy tests "have been used at times as a discriminatory weapon against some minorities, not only Negroes but Americans of Mexican ancestry, and American Indians") (opinion of Douglas, J.); *id.*, at 216 ("Congress could have determined that racial prejudice is prevalent throughout the Nation, and that literacy tests unduly lend themselves to discriminatory application, either conscious or unconscious") (opinion of Harlan, J.); *id.*, at 235 ("[T]here is no question but that Congress could legitimately have concluded that the use of literacy tests anywhere within the United States has the inevitable effect of denying the vote to members of racial minorities whose inability to pass such tests is the direct consequence of previous governmental discrimination in education") (opinion of Brennan, J.); *id.*, at 284 ("[N]ationwide [suspension of literacy tests] may be reasonably thought appropriate when Congress acts against an evil such as racial discrimination which in varying degrees manifests itself in every part of the country") (opinion of Stewart, J.); *City of Rome*, 446 U. S., at 182 ("Congress' considered determination that at least another 7 years of statutory remedies were necessary to counter the

perpetuation of 95 years of pervasive voting discrimination is both unsurprising and unassailable"); *Morgan*, 384 U. S., at 656 (Congress had a factual basis to conclude that New York's literacy requirement "constituted an invidious discrimination in violation of the Equal Protection Clause").

### 3

Any suggestion that Congress has a substantive, nonremedial power under the Fourteenth Amendment is not supported by our case law. In *Oregon* v. *Mitchell, supra,* at 112, a majority of the Court concluded Congress had exceeded its enforcement powers by enacting legislation lowering the minimum age of voters from 21 to 18 in state and local elections. The five Members of the Court who reached this conclusion explained that the legislation intruded into an area reserved by the Constitution to the States. See 400 U. S., at 125 (concluding that the legislation was unconstitutional because the Constitution "reserves to the States the power to set voter qualifications in state and local elections") (opinion of Black, J.); *id.*, at 154 (explaining that the "Fourteenth Amendment was never intended to restrict the authority of the States to allocate their political power as they see fit") (opinion of Harlan, J.); *id.*, at 294 (concluding that States, not Congress, have the power "to establish a qualification for voting based on age") (opinion of Stewart, J., joined by Burger, C. J., and Blackmun, J.). Four of these five were explicit in rejecting the position that § 5 endowed Congress with the power to establish the meaning of constitutional provisions. See *id.*, at 209 (opinion of Harlan, J.); *id.*, at 296 (opinion of Stewart, J.). Justice Black's rejection of this position might be inferred from his disagreement with Congress' interpretation of the Equal Protection Clause. See *id.*, at 125.

There is language in our opinion in *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966), which could be interpreted as acknowledging a power in Congress to enact legislation that expands

the rights contained in § 1 of the Fourteenth Amendment. This is not a necessary interpretation, however, or even the best one. In *Morgan*, the Court considered the constitutionality of § 4(e) of the Voting Rights Act of 1965, which provided that no person who had successfully completed the sixth primary grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English could be denied the right to vote because of an inability to read or write English. New York's Constitution, on the other hand, required voters to be able to read and write English. The Court provided two related rationales for its conclusion that § 4(e) could "be viewed as a measure to secure for the Puerto Rican community residing in New York nondiscriminatory treatment by government." *Id.*, at 652. Under the first rationale, Congress could prohibit New York from denying the right to vote to large segments of its Puerto Rican community, in order to give Puerto Ricans "enhanced political power" that would be "helpful in gaining nondiscriminatory treatment in public services for the entire Puerto Rican community." *Ibid.* Section 4(e) thus could be justified as a remedial measure to deal with "discrimination in governmental services." *Id.*, at 653. The second rationale, an alternative holding, did not address discrimination in the provision of public services but "discrimination in establishing voter qualifications." *Id.*, at 654. The Court perceived a factual basis on which Congress could have concluded that New York's literacy requirement "constituted an invidious discrimination in violation of the Equal Protection Clause." *Id.*, at 656. Both rationales for upholding § 4(e) rested on unconstitutional discrimination by New York and Congress' reasonable attempt to combat it. As Justice Stewart explained in *Oregon* v. *Mitchell, supra,* at 296, interpreting *Morgan* to give Congress the power to interpret the Constitution "would require an enormous extension of that decision's rationale."

If Congress could define its own powers by altering the Fourteenth Amendment's meaning, no longer would the Constitution be "superior paramount law, unchangeable by ordinary means." It would be "on a level with ordinary legislative acts, and, like other acts, . . . alterable when the legislature shall please to alter it." *Marbury* v. *Madison*, 1 Cranch, at 177. Under this approach, it is difficult to conceive of a principle that would limit congressional power. See Van Alstyne, The Failure of the Religious Freedom Restoration Act under Section 5 of the Fourteenth Amendment, 46 Duke L. J. 291, 292–303 (1996). Shifting legislative majorities could change the Constitution and effectively circumvent the difficult and detailed amendment process contained in Article V.

We now turn to consider whether RFRA can be considered enforcement legislation under § 5 of the Fourteenth Amendment.

## B

Respondent contends that RFRA is a proper exercise of Congress' remedial or preventive power. The Act, it is said, is a reasonable means of protecting the free exercise of religion as defined by *Smith*. It prevents and remedies laws which are enacted with the unconstitutional object of targeting religious beliefs and practices. See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 533 (1993) ("[A] law targeting religious beliefs as such is never permissible"). To avoid the difficulty of proving such violations, it is said, Congress can simply invalidate any law which imposes a substantial burden on a religious practice unless it is justified by a compelling interest and is the least restrictive means of accomplishing that interest. If Congress can prohibit laws with discriminatory effects in order to prevent racial discrimination in violation of the Equal Protection Clause, see *Fullilove* v. *Klutznick*, 448 U. S. 448, 477 (1980) (plurality opinion); *City of Rome*, 446 U. S., at 177, then it can do the same, respondent argues, to promote religious liberty.

While preventive rules are sometimes appropriate reme-
dial measures, there must be a congruence between the
means used and the ends to be achieved. The appropriate-
ness of remedial measures must be considered in light of the
evil presented. See *South Carolina* v. *Katzenbach,* 383
U. S., at 308. Strong measures appropriate to address one
harm may be an unwarranted response to another, lesser
one. *Id.,* at 334.

A comparison between RFRA and the Voting Rights Act
is instructive. In contrast to the record which confronted
Congress and the Judiciary in the voting rights cases,
RFRA's legislative record lacks examples of modern in-
stances of generally applicable laws passed because of reli-
gious bigotry. The history of persecution in this country de-
tailed in the hearings mentions no episodes occurring in the
past 40 years. See, *e. g.,* Religious Freedom Restoration Act
of 1991, Hearings on H. R. 2797 before the Subcommittee on
Civil and Constitutional Rights of the House Committee on
the Judiciary, 102d Cong., 2d Sess., 331–334 (1993) (statement
of Douglas Laycock) (House Hearings); The Religious Free-
dom Restoration Act, Hearing on S. 2969 before the Senate
Committee on the Judiciary, 102d Cong., 2d Sess., 30–31
(1993) (statement of Dallin H. Oaks) (Senate Hearing); *id.,* at
68–76 (statement of Douglas Laycock); Religious Freedom
Restoration Act of 1990, Hearing on H. R. 5377 before the
Subcommittee on Civil and Constitutional Rights of the
House Committee on the Judiciary, 101st Cong., 2d Sess., 49
(1991) (statement of John H. Buchanan, Jr.) (1990 House
Hearing). The absence of more recent episodes stems from
the fact that, as one witness testified, "deliberate persecu-
tion is not the usual problem in this country." House Hear-
ings 334 (statement of Douglas Laycock). See also House
Report 2 ("[L]aws directly targeting religious practices have
become increasingly rare"). Rather, the emphasis of the
hearings was on laws of general applicability which place in-
cidental burdens on religion. Much of the discussion cen-

tered upon anecdotal evidence of autopsies performed on Jewish individuals and Hmong immigrants in violation of their religious beliefs, see, *e. g.,* House Hearings 81 (statement of Nadine Strossen); *id.,* at 107–110 (statement of William Yang); *id.,* at 118 (statement of Rep. Stephen J. Solarz); *id.,* at 336 (statement of Douglas Laycock); Senate Hearing 5–6, 14–26 (statement of William Yang); *id.,* at 27–28 (statement of Hmong-Lao Unity Assn., Inc.); *id.,* at 50 (statement of Baptist Joint Committee); see also Senate Report 8; House Report 5–6, and n. 14, and on zoning regulations and historic preservation laws (like the one at issue here), which, as an incident of their normal operation, have adverse effects on churches and synagogues. See, *e. g.,* House Hearings 17, 57 (statement of Robert P. Dugan, Jr.); *id.,* at 81 (statement of Nadine Strossen); *id.,* at 122–123 (statement of Rep. Stephen J. Solarz); *id.,* at 157 (statement of Edward M. Gaffney, Jr.); *id.,* at 327 (statement of Douglas Laycock); Senate Hearing 143–144 (statement of Forest D. Montgomery); 1990 House Hearing 39 (statement of Robert P. Dugan, Jr.); see also Senate Report 8; House Report 5–6, and n. 14. It is difficult to maintain that they are examples of legislation enacted or enforced due to animus or hostility to the burdened religious practices or that they indicate some widespread pattern of religious discrimination in this country. Congress' concern was with the incidental burdens imposed, not the object or purpose of the legislation. See House Report 2; Senate Report 4–5; House Hearings 64 (statement of Nadine Strossen); *id.,* at 117–118 (statement of Rep. Stephen J. Solarz); 1990 House Hearing 14 (statement of Rep. Stephen J. Solarz). This lack of support in the legislative record, however, is not RFRA's most serious shortcoming. Judicial deference, in most cases, is based not on the state of the legislative record Congress compiles but "on due regard for the decision of the body constitutionally appointed to decide." *Oregon* v. *Mitchell,* 400 U. S., at 207 (opinion of Harlan, J.). As a gen-

eral matter, it is for Congress to determine the method by which it will reach a decision.

Regardless of the state of the legislative record, RFRA cannot be considered remedial, preventive legislation, if those terms are to have any meaning. RFRA is so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior. It appears, instead, to attempt a substantive change in constitutional protections. Preventive measures prohibiting certain types of laws may be appropriate when there is reason to believe that many of the laws affected by the congressional enactment have a significant likelihood of being unconstitutional. See *City of Rome*, 446 U. S., at 177 (since "jurisdictions with a demonstrable history of intentional racial discrimination . . . create the risk of purposeful discrimination," Congress could "prohibit changes that have a discriminatory impact" in those jurisdictions). Remedial legislation under §5 "should be adapted to the mischief and wrong which the [Fourteenth] [A]mendment was intended to provide against." *Civil Rights Cases*, 109 U. S., at 13.

RFRA is not so confined. Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter. RFRA's restrictions apply to every agency and official of the Federal, State, and local Governments. 42 U. S. C. § 2000bb–2(1). RFRA applies to all federal and state law, statutory or otherwise, whether adopted before or after its enactment. § 2000bb–3(a). RFRA has no termination date or termination mechanism. Any law is subject to challenge at any time by any individual who alleges a substantial burden on his or her free exercise of religion.

The reach and scope of RFRA distinguish it from other measures passed under Congress' enforcement power, even in the area of voting rights. In *South Carolina* v. *Katzenbach*, the challenged provisions were confined to those re-

gions of the country where voting discrimination had been most flagrant, see 383 U. S., at 315, and affected a discrete class of state laws, *i. e.*, state voting laws. Furthermore, to ensure that the reach of the Voting Rights Act was limited to those cases in which constitutional violations were most likely (in order to reduce the possibility of overbreadth), the coverage under the Act would terminate "at the behest of States and political subdivisions in which the danger of substantial voting discrimination has not materialized during the preceding five years." *Id.*, at 331. The provisions restricting and banning literacy tests, upheld in *Katzenbach* v. *Morgan*, 384 U. S. 641 (1966), and *Oregon* v. *Mitchell, supra*, attacked a particular type of voting qualification, one with a long history as a "notorious means to deny and abridge voting rights on racial grounds." *South Carolina* v. *Katzenbach*, 383 U. S., at 355 (Black, J., concurring and dissenting). In *City of Rome, supra*, the Court rejected a challenge to the constitutionality of a Voting Rights Act provision which required certain jurisdictions to submit changes in electoral practices to the Department of Justice for preimplementation review. The requirement was placed only on jurisdictions with a history of intentional racial discrimination in voting. *Id.*, at 177. Like the provisions at issue in *South Carolina* v. *Katzenbach*, this provision permitted a covered jurisdiction to avoid preclearance requirements under certain conditions and, moreover, lapsed in seven years. This is not to say, of course, that § 5 legislation requires termination dates, geographic restrictions, or egregious predicates. Where, however, a congressional enactment pervasively prohibits constitutional state action in an effort to remedy or to prevent unconstitutional state action, limitations of this kind tend to ensure Congress' means are proportionate to ends legitimate under § 5.

The stringent test RFRA demands of state laws reflects a lack of proportionality or congruence between the means adopted and the legitimate end to be achieved. If an objector can show a substantial burden on his free exercise, the

State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest. Claims that a law substantially burdens someone's exercise of religion will often be difficult to contest. See *Smith*, 494 U. S., at 887 ("What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act₁ is 'central' to his personal faith?"); *id.*, at 907 ("The distinction between questions of centrality and questions of sincerity and burden is admittedly fine . . .") (O'CONNOR, J., concurring in judgment). Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law. If " 'compelling interest' really means what it says . . . , many laws will not meet the test. . . . [The test] would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind." *Id.*, at 888. Laws valid under *Smith* would fall under RFRA without regard to whether they had the object of stifling or punishing free exercise. We make these observations not to reargue the position of the majority in *Smith* but to illustrate the substantive alteration of its holding attempted by RFRA. Even assuming RFRA would be interpreted in effect to mandate some lesser test, say, one equivalent to intermediate scrutiny, the statute nevertheless would require searching judicial scrutiny of state law with the attendant likelihood of invalidation. This is a considerable congressional intrusion into the States' traditional prerogatives and general authority to regulate for the health and welfare of their citizens.

The substantial costs RFRA exacts, both in practical terms of imposing a heavy litigation burden on the States and in terms of curtailing their traditional general regulatory power, far exceed any pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in *Smith*. Simply put, RFRA is not designed to identify and counteract state laws likely to be unconstitutional because of

their treatment of religion. In most cases, the state laws to which RFRA applies are not ones which will have been motivated by religious bigotry. If a state law disproportion-ately burdened a particular class of religious observers, this circumstance might be evidence of an impermissible legislative motive. Cf. *Washington* v. *Davis*, 426 U. S. 229, 241 (1976). RFRA's substantial-burden test, however, is not even a discriminatory-effects or disparate-impact test. It is a reality of the modern regulatory state that numerous state laws, such as the zoning regulations at issue here, impose a substantial burden on a large class of individuals. When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs. In addition, the Act imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify—which also indicates that the legislation is broader than is appropriate if the goal is to prevent and remedy constitutional violations.

When Congress acts within its sphere of power and responsibilities, it has not just the right but the duty to make its own informed judgment on the meaning and force of the Constitution. This has been clear from the early days of the Republic. In 1789, when a Member of the House of Representatives objected to a debate on the constitutionality of legislation based on the theory that "it would be officious" to consider the constitutionality of a measure that did not affect the House, James Madison explained that "it is incontrovertibly of as much importance to this branch of the Government as to any other, that the constitution should be preserved entire. It is our duty." 1 Annals of Congress 500 (1789). Were it otherwise, we would not afford Congress the presumption of validity its enactments now enjoy.

Our national experience teaches that the Constitution is preserved best when each part of the Government respects

both the Constitution and the proper actions and determinations of the other branches. When the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is. *Marbury* v. *Madison,* 1 Cranch, at 177. When the political branches of the Government act against the background of a judicial interpretation of the Constitution already issued, it must be understood that in later cases and controversies the Court will treat its precedents with the respect due them under settled principles, including *stare decisis,* and contrary expectations must be disappointed. RFRA was designed to control cases and controversies, such as the one before us; but as the provisions of the federal statute here invoked are beyond congressional authority, it is this Court's precedent, not RFRA, which must control.

\* \* \*

It is for Congress in the first instance to "determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," and its conclusions are entitled to much deference. *Katzenbach* v. *Morgan,* 384 U. S., at 651. Congress' discretion is not unlimited, however, and the courts retain the power, as they have since *Marbury* v. *Madison,* to determine if Congress has exceeded its authority under the Constitution. Broad as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance. The judgment of the Court of Appeals sustaining the Act's constitutionality is reversed.

*It is so ordered.*

JUSTICE STEVENS, concurring.

In my opinion, the Religious Freedom Restoration Act of 1993 (RFRA) is a "law respecting an establishment of religion" that violates the First Amendment to the Constitution.

If the historic landmark on the hill in Boerne happened to be a museum or an art gallery owned by an atheist, it would not be eligible for an exemption from the city ordinances that forbid an enlargement of the structure. Because the landmark is owned by the Catholic Church, it is claimed that RFRA gives its owner a federal statutory entitlement to an exemption from a generally applicable, neutral civil law. Whether the Church would actually prevail under the statute or not, the statute has provided the Church with a legal weapon that no atheist or agnostic can obtain. This governmental preference for religion, as opposed to irreligion, is forbidden by the First Amendment. *Wallace v. Jaffree*, 472 U. S. 38, 52–55 (1985).

Justice SCALIA, with whom Justice STEVENS joins, concurring in part.

I write to respond briefly to the claim of Justice O'CONNOR's dissent (hereinafter the dissent) that historical materials support a result contrary to the one reached in *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U. S. 872 (1990). See *post*, p. 544 (dissenting opinion). We held in *Smith* that the Constitution's Free Exercise Clause "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" 494 U. S., at 879 (quoting *United States v. Lee*, 455 U. S. 252, 263, n. 3 (1982) (STEVENS, J., concurring in judgment)). The material that the dissent claims is at odds with *Smith* either has little to say about the issue or is in fact more consistent with *Smith* than with the dissent's interpretation of the Free Exercise Clause. The dissent's extravagant claim that the historical record shows *Smith* to have been wrong should be compared with the assessment of the most prominent scholarly critic of *Smith*, who, after an extensive review of the historical record, was willing to venture no more than that "constitu-

tionally compelled exemptions [from generally applicable laws regulating conduct] were *within the contemplation* of the framers and ratifiers as a *possible interpretation* of the free exercise clause." McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1415 (1990) (emphasis added); see also Hamburger, A Constitutional Right of Religious Exemption: An Historical Perspective, 60 Geo. Wash. Law Rev. 915 (1992) (arguing that historical evidence supports *Smith*'s interpretation of free exercise).

The dissent first claims that *Smith*'s interpretation of the Free Exercise Clause departs from the understanding reflected in various statutory and constitutional protections of religion enacted by Colonies, States, and Territories in the period leading up to the ratification of the Bill of Rights. *Post*, at 550–557. But the protections afforded by those enactments are in fact more consistent with *Smith*'s interpretation of free exercise than with the dissent's understanding of it. The Free Exercise Clause, the dissent claims, "is best understood as an affirmative guarantee of the right to participate in religious practices and conduct without impermissible governmental interference, even when such conduct conflicts with a neutral, generally applicable law"; thus, even neutral laws of general application may be invalid if they burden religiously motivated conduct. *Post*, at 546. However, the early "free exercise" enactments cited by the dissent protect only against action that is taken "for" or "in respect of" religion, *post*, at 551–553 (Maryland Act Concerning Religion of 1649, Rhode Island Charter of 1663, and New Hampshire Constitution); or action taken "on account of" religion, *post*, at 553–554 (Maryland Declaration of Rights of 1776 and Northwest Ordinance of 1787); or "discriminat[ory]" action, *post*, at 553 (New York Constitution); or, finally (and unhelpfully for purposes of interpreting "free exercise" in the Federal Constitution), action that interferes with the "free exercise" of religion, *post*, at 551, 554 (Maryland Act

Concerning Religion of 1649 and Georgia Constitution). It is eminently arguable that application of neutral, generally applicable laws of the sort the dissent refers to—such as zoning laws, *post*, at 547—would not constitute action taken "for," "in respect of," or "on account of" one's religion, or "discriminatory" action.

Assuming, however, that the affirmative protection of religion accorded by the early "free exercise" enactments sweeps as broadly as the dissent's theory would require, those enactments do not support the dissent's view, since they contain "provisos" that significantly qualify the affirmative protection they grant. According to the dissent, the "provisos" support *its* view because they would have been "superfluous" if "the Court was correct in *Smith* that generally applicable laws are enforceable regardless of religious conscience." *Post*, at 554–555. I disagree. In fact, the most plausible reading of the "free exercise" enactments (if their affirmative provisions are read broadly, as the dissent's view requires) is a virtual restatement of *Smith:* Religious exercise shall be permitted *so long as it does not violate general laws governing conduct.* The "provisos" in the enactments negate a license to act in a manner "unfaithfull to the Lord Proprietary" (Maryland Act Concerning Religion of 1649), or "behav[e]" in other than a "peaceabl[e] and quie[t]" manner (Rhode Island Charter of 1663), or "disturb the public peace" (New Hampshire Constitution), or interfere with the "peace [and] safety of th[e] State" (New York, Maryland, and Georgia Constitutions), or "demea[n]" oneself in other than a "peaceable and orderly manner" (Northwest Ordinance of 1787). See *post*, at 551–554. At the time these provisos were enacted, keeping "peace" and "order" seems to have meant, precisely, obeying the laws. "[E]very breach of a law is against the peace." *Queen* v. *Lane*, 6 Mod. 128, 87 Eng. Rep. 884, 885 (Q. B. 1704). Even as late as 1828, when Noah Webster published his American Dictionary of the English Language, he gave as one of the meanings of "peace": "8. Public

tranquility; that quiet, order and security which is guaranteed by the laws; as, to keep the *peace;* to break the *peace.*" 2 An American Dictionary of the English Language 31 (1828).[1] This limitation upon the scope of religious exercise would have been in accord with the background political philosophy of the age (associated most prominently with John Locke), which regarded freedom as the right "to do only what was not lawfully prohibited," West, The Case Against a Right to Religion-Based Exemptions, 4 Notre Dame J. L., Ethics & Pub. Pol'y 591, 624 (1990). "Thus, the disturb-the-peace caveats apparently permitted government to deny religious freedom, not merely in the event of violence or force, but, more generally, upon the occurrence of illegal actions." Hamburger, *supra,* at 918–919.[2] And while, under this interpretation, these early "free exercise" enactments support the Court's judgment in *Smith,* I see no sensible interpretation that could cause them to support what I understand to be the position of JUSTICE O'CONNOR, or any of *Smith's* other critics. No one in that camp, to my knowledge, contends that their favored "compelling state interest" test conforms to any possible interpretation of "breach of peace and order"—*i. e.,* that *only* violence or force, or any other category of action (more limited than "violation of law") which can possibly be conveyed by the phrase "peace and order," justifies state prohibition of religiously motivated conduct.

---

[1] The word "licentious," used in several of the early enactments, likewise meant "[e]xceeding the limits of law." 2 An American Dictionary of the English Language 6 (1828).

[2] The same explanation applies, of course, to George Mason's initial draft of Virginia's religious liberty clause, see *post,* at 555. When it said "unless, under colour of religion, any man disturb the peace . . . of society," it probably meant "unless under color of religion any man break the law." Thus, it is not the case that *"both* Mason's and [James] Madison's formulations envisioned that, when there was a conflict [between religious exercise and generally applicable laws], a person's interest in freely practicing his religion was to be balanced against state interests," *post,* at 556—at least insofar as regulation of *conduct* was concerned.

Apart from the early "free exercise" enactments of Colonies, States, and Territories, the dissent calls attention to those bodies', and the Continental Congress's, legislative accommodation of religious practices prior to ratification of the Bill of Rights. *Post,* at 557–560. This accommodation—which took place both before and after enactment of the state constitutional protections of religious liberty—suggests (according to the dissent) that "the drafters and ratifiers of the First Amendment . . . assumed courts would apply the Free Exercise Clause similarly." *Post,* at 560. But that legislatures sometimes (though not always)[3] found it "appropriate," *post,* at 559, to accommodate religious practices does not establish that accommodation was understood to be constitutionally *mandated* by the Free Exercise Clause. As we explained in *Smith,* "to say that a nondiscriminatory religious-practice exemption is permitted, or even that it is desirable, is not to say that it is constitutionally required." 494 U. S., at 890. "Values that are protected against government interference through enshrinement in the Bill of Rights are not thereby banished from the political process." *Ibid.*

The dissent's final source of claimed historical support consists of statements of certain of the Framers in the context of debates about proposed legislative enactments or debates over general principles (not in connection with the drafting of State or Federal Constitutions). Those statements are subject to the same objection as was the evidence about legislative accommodation: There is no reason to think they were meant to describe what was constitutionally required (and judicially enforceable), as opposed to what was thought to be legislatively or even morally desirable. Thus, for example, the pamphlet written by James Madison opposing Virginia's proposed general assessment for support of reli-

---

[3] The dissent mentions, for example, that only 7 of the 13 Colonies had exempted Quakers from military service by the mid-1700's; and that "*virtually* all" of the States had enacted oath exemptions by 1789. *Post,* at 558 (emphasis added).

gion, *post*, at 560–561, does not argue that the assessment would violate the "free exercise" provision in the Virginia Declaration of Rights, although that provision had been enacted into law only eight years earlier, *post*, at 556; rather the pamphlet argues that the assessment wrongly placed civil society ahead of personal religious belief and, thus, should not be approved by the legislators, *post*, at 560–561. Likewise, the letter from George Washington to the Quakers, *post*, at 562, by its own terms refers to Washington's "wish and desire" that religion be accommodated, not his belief that existing constitutional provisions required accommodation. These and other examples offered by the dissent reflect the speakers' views of the "proper" relationship between government and religion, *post*, at 563, but not their views (at least insofar as the content or context of the material suggests) of the constitutionally required relationship. The one exception is the statement by Thomas Jefferson that he considered "the government of the United States as interdicted by the Constitution from intermeddling with religious institutions, their doctrines, discipline, or exercises," *post*, at 562 (internal quotation marks omitted); but it is quite clear that Jefferson did not in fact espouse the broad principle of affirmative accommodation advocated by the dissent, see McConnell, 103 Harv. L. Rev., at 1449–1452.

It seems to me that the most telling point made by the dissent is to be found, not in what it says, but in what it fails to say. Had the understanding in the period surrounding the ratification of the Bill of Rights been that the various forms of accommodation discussed by the dissent were constitutionally required (either by State Constitutions or by the Federal Constitution), it would be surprising not to find a single state or federal case refusing to enforce a generally applicable statute because of its failure to make accommodation. Yet the dissent cites none—and to my knowledge, and to the knowledge of the academic defenders of the dissent's position, see, *e. g., id.*, at 1504, 1506–1511 (discussing early

cases), none exists. The closest one can come in the period prior to 1850 is the decision of a New York City municipal court in 1813, holding that the New York Constitution of 1777, quoted *post*, at 553, required acknowledgment of a priest-penitent privilege, to protect a Catholic priest from being compelled to testify as to the contents of a confession. *People* v. *Phillips*, Court of General Sessions, City of New York (June 14, 1813), excerpted in Privileged Communications to Clergymen, 1 Cath. Law. 199 (1955). Even this lone case is weak authority, not only because it comes from a minor court,[4] but also because it did not involve a statute, and the same result might possibly have been achieved (without invoking constitutional entitlement) by the court's simply modifying the common-law rules of evidence to recognize such a privilege. On the other side of the ledger, moreover, there are two cases, from the Supreme Court of Pennsylvania, flatly rejecting the dissent's view. In *Simon's Executors* v. *Gratz*, 2 Pen. & W. 412 (Pa. 1831), the court held that a litigant was not entitled to a continuance of trial on the ground that appearing on his Sabbath would violate his religious principles. And in *Stansbury* v. *Marks*, 2 Dall. 213 (Pa. 1793), decided just two years after the ratification of the Bill of Rights, the court imposed a fine on a witness who "refused to be sworn, because it was his Sabbath."[5]

I have limited this response to the new items of "historical evidence" brought forward by today's dissent. (The dis-

---

[4] The Court of General Sessions was a mayor's court, and the ruling in *Phillips* was made by DeWitt Clinton, the last mayor to preside over that court, which was subsequently reconstituted as the Court of Common Pleas. Clinton had never been a jurist, and indeed had never practiced law. Some years before *Phillips*, he was instrumental in removing the political disabilities of Catholics in New York. See 4 Dictionary of American Biography 221–222, 224 (1943).

[5] Indeed, the author of *Simon's Executors* could well have written *Smith:* "[C]onsiderations of policy address themselves with propriety to the legislature, and not to a magistrate whose course is prescribed not by discretion, but rules already established." 2 Pen. & W., at 417.

sent's claim that "[b]efore *Smith,* our free exercise cases were generally in keeping" with the dissent's view, *post,* at 546, is adequately answered in *Smith* itself.) The historical evidence marshalled by the dissent cannot fairly be said to demonstrate the correctness of *Smith;* but it is more supportive of that conclusion than destructive of it. And, to return to a point I made earlier, that evidence is not compatible with any theory I am familiar with that has been proposed as an alternative to *Smith.* The dissent's approach has, of course, great popular attraction. Who can possibly be against the abstract proposition that government should not, even in its general, nondiscriminatory laws, place unreasonable burdens upon religious practice? Unfortunately, however, that abstract proposition must ultimately be reduced to concrete cases. The issue presented by *Smith* is, quite simply, whether the people, through their elected representatives, or rather this Court, shall control the outcome of those concrete cases. For example, shall it be the determination of this Court, or rather of the people, whether (as the dissent apparently believes, *post,* at 547) church construction will be exempt from zoning laws? The historical evidence put forward by the dissent does nothing to undermine the conclusion we reached in *Smith:* It shall be the people.

JUSTICE O'CONNOR, with whom JUSTICE BREYER joins except as to the first paragraph of Part I, dissenting.

I dissent from the Court's disposition of this case. I agree with the Court that the issue before us is whether the Religious Freedom Restoration Act of 1993 (RFRA) is a proper exercise of Congress' power to enforce § 5 of the Fourteenth Amendment. But as a yardstick for measuring the constitutionality of RFRA, the Court uses its holding in *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), the decision that prompted Congress to enact RFRA as a means of more rigorously enforcing the Free Exercise Clause. I remain of the view that *Smith* was

wrongly decided, and I would use this case to reexamine the Court's holding there. Therefore, I would direct the parties to brief the question whether *Smith* represents the correct understanding of the Free Exercise Clause and set the case for reargument. If the Court were to correct the misinterpretation of the Free Exercise Clause set forth in *Smith*, it would simultaneously put our First Amendment jurisprudence back on course and allay the legitimate concerns of a majority in Congress who believed that *Smith* improperly restricted religious liberty. We would then be in a position to review RFRA in light of a proper interpretation of the Free Exercise Clause.

I

I agree with much of the reasoning set forth in Part III–A of the Court's opinion. Indeed, if I agreed with the Court's standard in *Smith*, I would join the opinion. As the Court's careful and thorough historical analysis shows, Congress lacks the "power to decree the *substance* of the Fourteenth Amendment's restrictions on the States." *Ante*, at 519 (emphasis added). Rather, its power under § 5 of the Fourteenth Amendment extends only to *enforcing* the Amendment's provisions. In short, Congress lacks the ability independently to define or expand the scope of constitutional rights by statute. Accordingly, whether Congress has exceeded its § 5 powers turns on whether there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Ante*, at 520. This recognition does not, of course, in any way diminish Congress' obligation to draw its own conclusions regarding the Constitution's meaning. Congress, no less than this Court, is called upon to consider the requirements of the Constitution and to act in accordance with its dictates. But when it enacts legislation in furtherance of its delegated powers, Congress must make its judgments consistent with this Court's exposition of the Constitution and with the lim-

its placed on its legislative authority by provisions such as the Fourteenth Amendment.

The Court's analysis of whether RFRA is a constitutional exercise of Congress' § 5 power, set forth in Part III–B of its opinion, is premised on the assumption that *Smith* correctly interprets the Free Exercise Clause. This is an assumption that I do not accept. I continue to believe that *Smith* adopted an improper standard for deciding free exercise claims. In *Smith*, five Members of this Court—without briefing or argument on the issue—interpreted the Free Exercise Clause to permit the government to prohibit, without justification, conduct mandated by an individual's religious beliefs, so long as the prohibition is generally applicable. Contrary to the Court's holding in that case, however, the Free Exercise Clause is not simply an antidiscrimination principle that protects only against those laws that single out religious practice for unfavorable treatment. See *Smith, supra,* at 892–903 (O'CONNOR, J., concurring in judgment). Rather, the Clause is best understood as an affirmative guarantee of the right to participate in religious practices and conduct without impermissible governmental interference, even when such conduct conflicts with a neutral, generally applicable law. Before *Smith,* our free exercise cases were generally in keeping with this idea: where a law substantially burdened religiously motivated conduct—regardless whether it was specifically targeted at religion or applied generally—we required government to justify that law with a compelling state interest and to use means narrowly tailored to achieve that interest. See 494 U. S., at 894 (citing *Hernandez* v. *Commissioner,* 490 U. S. 680, 699 (1989); *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U. S. 136, 141 (1987); *United States* v. *Lee,* 455 U. S. 252, 257–258 (1982); *McDaniel* v. *Paty,* 435 U. S. 618, 626–629 (1978); *Wisconsin* v. *Yoder,* 406 U. S. 205, 215 (1972); *Gillette* v. *United States,* 401 U. S. 437, 462 (1971); *Sherbert* v. *Verner,* 374 U. S. 398, 403 (1963)).

The Court's rejection of this principle in *Smith* is supported neither by precedent nor, as discussed below, by history. The decision has harmed religious liberty. For example, a Federal District Court, in reliance on *Smith*, ruled that the Free Exercise Clause was not implicated where Hmong natives objected on religious grounds to their son's autopsy, conducted pursuant to a generally applicable state law. *Yang* v. *Sturner*, 750 F. Supp. 558, 559 (RI 1990). The Court of Appeals for the Eighth Circuit held that application of a city's zoning laws to prevent a church from conducting services in an area zoned for commercial uses raised no free exercise concerns, even though the city permitted secular not-for-profit organizations in that area. *Cornerstone Bible Church* v. *Hastings*, 948 F. 2d 464 (1991); see also *Rector of St. Bartholomew's Church* v. *New York*, 914 F. 2d 348, 355 (CA2 1990) (no free exercise claim where city's application of facially neutral landmark designation law "drastically restricted the Church's ability to raise revenue to carry out its various charitable and ministerial programs"), cert. denied, 499 U. S. 905 (1991); *State* v. *Hershberger*, 462 N. W. 2d 393 (Minn. 1990) (Free Exercise Clause provided no basis for exempting an Amish farmer from displaying a bright orange triangle on his buggy, to which the farmer objected on religious grounds, even though the evidence showed that some other material would have served the State's purpose equally well). These cases demonstrate that lower courts applying *Smith* no longer find necessary a searching judicial inquiry into the possibility of reasonably accommodating religious practice.

*Stare decisis* concerns should not prevent us from revisiting our holding in *Smith*. " '[S]tare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.' " *Adarand Constructors, Inc.* v. *Peña*, 515 U. S.

200, 231 (1995) (quoting *Helvering* v. *Hallock*, 309 U. S. 106, 119 (1940)).  This principle is particularly true in constitutional cases, where—as this case so plainly illustrates—"correction through legislative action is practically impossible." *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 63 (1996) (internal quotation marks and citation omitted).  I believe that, in light of both our precedent and our Nation's tradition of religious liberty, *Smith* is demonstrably wrong.  Moreover, it is a recent decision.  As such, it has not engendered the kind of reliance on its continued application that would militate against overruling it.  Cf. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 855–856 (1992).

Accordingly, I believe that we should reexamine our holding in *Smith*, and do so in this very case.  In its place, I would return to a rule that requires government to justify any substantial burden on religiously motivated conduct by a compelling state interest and to impose that burden only by means narrowly tailored to achieve that interest.

## II

I shall not restate what has been said in other opinions, which have demonstrated that *Smith* is gravely at odds with our earlier free exercise precedents.  See *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520, 570–571 (1993) (SOUTER, J., concurring in part and concurring in judgment) (stating that it is "difficult to escape the conclusion that, whatever *Smith*'s virtues, they do not include a comfortable fit with settled law"); *Smith*, 494 U. S., at 894–901 (O'CONNOR, J., concurring in judgment); see also McConnell, Free Exercise Revisionism and the *Smith* Decision, 57 U. Chi. L. Rev. 1109, 1120–1127 (1990).  Rather, I examine here the early American tradition of religious free exercise to gain insight into the original understanding of the Free Exercise Clause—an inquiry the Court in *Smith* did not undertake.  We have previously recognized the importance of interpreting the Religion Clauses in light of their history. *Lynch* v. *Donnelly*, 465 U. S. 668, 673 (1984) ("The Court's

interpretation of the Establishment Clause has comported with what history reveals was the contemporaneous understanding of its guarantees"); *School Dist. of Abington Township* v. *Schempp*, 374 U. S. 203, 212–214 (1963).

The historical evidence casts doubt on the Court's current interpretation of the Free Exercise Clause. The record instead reveals that its drafters and ratifiers more likely viewed the Free Exercise Clause as a guarantee that government may not unnecessarily hinder believers from freely practicing their religion, a position consistent with our pre-*Smith* jurisprudence.

## A

The original Constitution, drafted in 1787 and ratified by the States in 1788, had no provisions safeguarding individual liberties, such as freedom of speech or religion. Federalists, the chief supporters of the new Constitution, took the view that amending the Constitution to explicitly protect individual freedoms was superfluous, since the rights that the amendments would protect were already completely secure. See, *e. g.*, 1 Annals of Congress 440, 443–444, 448–459 (Gales and Seaton ed. 1834) (remarks of James Madison, June 8, 1789). Moreover, they feared that guaranteeing certain civil liberties might backfire, since the express mention of some freedoms might imply that others were not protected. According to Alexander Hamilton, a Bill of Rights would even be dangerous, in that by specifying "various exceptions to powers" not granted, it "would afford a colorable pretext to claim more than were granted." The Federalist No. 84, p. 513 (C. Rossiter ed. 1961). Anti-Federalists, however, insisted on more definite guarantees. Apprehensive that the newly established Federal Government would overwhelm the rights of States and individuals, they wanted explicit assurances that the Federal Government had no power in matters of personal liberty. T. Curry, The First Freedoms: Church and State in America to the Passage of the First Amendment 194 (1986). Additionally, Baptists and other Protestant dissenters feared for their religious liberty under

the new Federal Government and called for an amendment guaranteeing religious freedom. *Id.*, at 198.

In the end, legislators acceded to these demands. By December 1791, the Bill of Rights had been added to the Constitution. With respect to religious liberty, the First Amendment provided: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U. S. Const., Amdt. 1. Neither the First Congress nor the ratifying state legislatures debated the question of religious freedom in much detail, nor did they directly consider the scope of the First Amendment's free exercise protection. It would be disingenuous to say that the Framers neglected to define precisely the scope of the Free Exercise Clause because the words "free exercise" had a precise meaning. L. Levy, Essays on American Constitutional History 173 (1972). As is the case for a number of the terms used in the Bill of Rights, it is not exactly clear what the Framers thought the phrase signified. *Ibid.* ("[I]t is astonishing to discover that the debate on a Bill of Rights was conducted on a level of abstraction so vague as to convey the impression that Americans of 1787–1788 had only the most nebulous conception of the meanings of the particular rights they sought to insure"). But a variety of sources supplement the legislative history and shed light on the original understanding of the Free Exercise Clause. These materials suggest that—contrary to *Smith*—the Framers did not intend simply to prevent the government from adopting laws that discriminated against religion. Although the Framers may not have asked precisely the questions about religious liberty that we do today, the historical record indicates that they believed that the Constitution affirmatively protects religious free exercise and that it limits the government's ability to intrude on religious practice.

B

The principle of religious "free exercise" and the notion that religious liberty deserved legal protection were by no

means new concepts in 1791, when the Bill of Rights was ratified. To the contrary, these principles were first articulated in this country in the Colonies of Maryland, Rhode Island, Pennsylvania, Delaware, and Carolina, in the mid-1600's. These Colonies, though established as sanctuaries for particular groups of religious dissenters, extended freedom of religion to groups—although often limited to Christian groups—beyond their own. Thus, they encountered early on the conflicts that may arise in a society made up of a plurality of faiths.

The term "free exercise" appeared in an American legal document as early as 1648, when Lord Baltimore extracted from the new Protestant Governor of Maryland and his councilors a promise not to disturb Christians, particularly Roman Catholics, in the "free exercise" of their religion. McConnell, The Origins and Historical Understanding of Free Exercise of Religion, 103 Harv. L. Rev. 1409, 1425 (1990) (hereinafter Origins of Free Exercise). Soon after, in 1649, the Maryland Assembly enacted the first free exercise clause by passing the Act Concerning Religion: "[N]oe person . . . professing to beleive in Jesus Christ, shall from henceforth bee any waies troubled, Molested or discountenanced for or in respect of his or her religion nor in the free exercise thereof . . . nor any way [be] compelled to the beleife or exercise of any other Religion against his or her consent, soe as they be not unfaithfull to the Lord Proprietary, or molest or conspire against the civill Governemt." Act Concerning Religion of 1649, reprinted in 5 The Founders' Constitution 49, 50 (P. Kurland & R. Lerner eds. 1987) (hereinafter Founders' Constitution). Rhode Island's Charter of 1663 used the analogous term "liberty of conscience." It protected residents from being in any ways "molested, punished, disquieted, or called in question, for any differences in opinione, in matters of religion, and doe not actually disturb the civil peace of our sayd colony." The Charter further provided that residents may "freely, and fully have and enjoy his and their own judgments, and conscience in matters of religious

concernments . . . ; they behaving themselves peaceably and quietly and not using this liberty to licentiousness and pro- faneness; nor to the civil injury, or outward disturbance of others." Charter of Rhode Island and Providence Planta- tions, 1663, in 8 W. Swindler, Sources and Documents of United States Constitutions 363 (1979) (hereinafter Swin- dler). Various agreements between prospective settlers and the proprietors of Carolina, New York, and New Jersey simi- larly guaranteed religious freedom, using language that par- alleled that of the Rhode Island Charter of 1663. See New York Act Declaring Rights & Priviledges (1691); Concession and Agreement of the Lords Proprietors of the Province of New Caesarea, or New-Jersey (1664); Laws of West New- Jersey, Art. X (1681); Fundamental Constitutions for East New-Jersey, Art. XVI (1683); First Charter of Carolina, Art. XVIII (1663). N. Cogan, The Complete Bill of Rights 23–27 (Galley 1997).

These documents suggest that, early in our country's history, several Colonies acknowledged that freedom to pur- sue one's chosen religious beliefs was an essential liberty. Moreover, these Colonies appeared to recognize that govern- ment should interfere in religious matters only when neces- sary to protect the civil peace or to prevent "licentiousness." In other words, when religious beliefs conflicted with civil law, religion prevailed unless important state interests mili- tated otherwise. Such notions parallel the ideas expressed in our pre-*Smith* cases—that government may not hinder believers from freely exercising their religion, unless neces- sary to further a significant state interest.

## C

The principles expounded in these early charters re- emerged over a century later in state constitutions that were adopted in the flurry of constitution drafting that followed the American Revolution. By 1789, every State but Con- necticut had incorporated some version of a free exercise

clause into its constitution. Origins of Free Exercise 1455. These state provisions, which were typically longer and more detailed than the Federal Free Exercise Clause, are perhaps the best evidence of the original understanding of the Constitution's protection of religious liberty. After all, it is reasonable to think that the States that ratified the First Amendment assumed that the meaning of the federal free exercise provision corresponded to that of their existing state clauses. The precise language of these state precursors to the Free Exercise Clause varied, but most guaranteed free exercise of religion or liberty of conscience, limited by particular, defined state interests. For example, the New York Constitution of 1777 provided:

> "[T]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed, within this State, to all mankind: *Provided*, That the liberty of conscience, hereby granted, *shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State.*" N. Y. Const., Art. XXXVIII, in 7 Swindler 178 (emphasis added).

Similarly, the New Hampshire Constitution of 1784 declared:

> "Every individual has a natural and unalienable right to worship GOD according to the dictates of his own conscience, and reason; and no subject shall be hurt, molested, or restrained in his person, liberty or estate for worshipping GOD, in the manner and season most agreeable to the dictates of his own conscience, . . . *provided he doth not disturb the public peace, or disturb others*, in their religious worship." N. H. Const., Art. I, § 5, in 6 Swindler 345 (emphasis added).

The Maryland Declaration of Rights of 1776 read:

> "[N]o person ought by any law to be molested in his person or estate on account of his religious persuasion

or profession, or for his religious practice; unless, under colour of religion, *any man shall disturb the good order, peace or safety of the State, or shall infringe the laws of morality, or injure others,* in their natural, civil, or religious rights." Md. Const., Declaration of Rights, Art. XXXIII in 4 Swindler 374 (emphasis added).

The religious liberty clause of the Georgia Constitution of 1777 stated:

"All persons whatever shall have the free exercise of their religion; provided *it be not repugnant to the peace and safety of the State.*" Ga. Const., Art. LVI, in 2 Swindler 449 (emphasis added).

In addition to these state provisions, the Northwest Ordinance of 1787—which was enacted contemporaneously with the drafting of the Constitution and reenacted by the First Congress—established a bill of rights for a territory that included what is now Ohio, Indiana, Michigan, Wisconsin, and part of Minnesota. Article I of the Ordinance declared:

"No person, *demeaning himself in a peaceable and orderly manner,* shall ever be molested on account of his mode of worship or religious sentiments, in the said territory." Northwest Territory Ordinance of 1787, Art. I, 1 Stat. 52 (emphasis added).

The language used in these state constitutional provisions and the Northwest Ordinance strongly suggests that, around the time of the drafting of the Bill of Rights, it was generally accepted that the right to "free exercise" required, where possible, accommodation of religious practice. If not—and if the Court was correct in *Smith* that generally applicable laws are enforceable regardless of religious conscience—there would have been no need for these documents to specify, as the New York Constitution did, that rights of conscience should not be "construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of [the] State." Such a proviso would have been su-

perfluous.   Instead, these documents make sense only if the right to free exercise was viewed as generally superior to ordinary legislation, to be overridden only when necessary to secure important government purposes.

The Virginia Legislature may have debated the issue most fully.   In May 1776, the Virginia Constitutional Convention wrote a constitution containing a Declaration of Rights with a clause on religious liberty.   The initial drafter of the clause, George Mason, proposed the following:

> "That religion, or the duty which we owe to our CREATOR, and the manner of discharging it, can be (directed) only by reason and conviction, not by force or violence; and therefore, *that all men should enjoy the fullest toleration in the exercise of religion,* according to the dictates of conscience, unpunished and unrestrained by the magistrate, *unless, under colour of religion, any man disturb the peace, the happiness, or safety of society.*   And that it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other."   Committee Draft of the Virginia Declaration of Rights, 1 Papers of George Mason 284–285 (R. Rutland ed. 1970) (emphasis added).

Mason's proposal did not go far enough for a 26-year-old James Madison, who had recently completed his studies at the Presbyterian College of Princeton.   He objected first to Mason's use of the term "toleration," contending that the word implied that the right to practice one's religion was a governmental favor, rather than an inalienable liberty.   Second, Madison thought Mason's proposal countenanced too much state interference in religious matters, since the "exercise of religion" would have yielded whenever it was deemed inimical to "the peace, happiness, or safety of society." Madison suggested the provision read instead:

> " 'That religion, or the duty we owe our Creator, and the manner of discharging it, being under the direction

of reason and conviction only, not of violence or compulsion, *all men are equally entitled to the full and free exercise of it, according to the dictates of conscience;* and therefore that no man or class of men ought on account of religion to be invested with peculiar emoluments or privileges, nor subjected to any penalties or disabilities, *unless under color of religion the preservation of equal liberty, and the existence of the State be manifestly endangered.'"*  G. Hunt, James Madison and Religious Liberty, in 1 Annual Report of the American Historical Association, H. R. Doc. No. 702, 57th Cong., 1st Sess., 163, 166–167 (1901) (emphasis added).

Thus, Madison wished to shift Mason's language of "toleration" to the language of rights.  See S. Cobb, The Rise of Religious Liberty in America 492 (1902) (reprint 1970) (noting that Madison objected to the word "toleration" as belonging to "a system where was an established Church, and where a certain liberty of worship was granted, not of right, but of grace").  Additionally, under Madison's proposal, the State could interfere in a believer's religious exercise only if the State would otherwise "be manifestly endangered."  In the end, neither Mason's nor Madison's language regarding the extent to which state interests could limit religious exercise made it into the Virginia Constitution's religious liberty clause.  Like the Federal Free Exercise Clause, the Virginia religious liberty clause was simply silent on the subject, providing only that "all men are equally entitled to the free exercise of religion, according to the dictates of conscience." Virginia Declaration of Rights, Art. XVI (1776), in 10 Swindler 50.  For our purposes, however, it is telling that *both* Mason's and Madison's formulations envisioned that, when there was a conflict, a person's interest in freely practicing his religion was to be balanced against state interests. Although Madison endorsed a more limited state interest exception than did Mason, the debate would have been irrelevant if either had thought the right to free exercise did not

include a right to be exempt from certain generally applicable laws. Presumably, the Virginia Legislature intended the scope of its free exercise provision to strike some middle ground between Mason's narrower and Madison's broader notions of the right to religious freedom.

## D

The practice of the Colonies and early States bears out the conclusion that, at the time the Bill of Rights was ratified, it was accepted that government should, when possible, accommodate religious practice. Unsurprisingly, of course, even in the American Colonies inhabited by people of religious persuasions, religious conscience and civil law rarely conflicted. Most 17th and 18th century Americans belonged to denominations of Protestant Christianity whose religious practices were generally harmonious with colonial law. Curry, The First Freedoms, at 219 ("The vast majority of Americans assumed that theirs was a Christian, i. e. Protestant, country, and they automatically expected that government would uphold the commonly agreed on Protestant ethos and morality"). Moreover, governments then were far smaller and less intrusive than they are today, which made conflict between civil law and religion unusual.

Nevertheless, tension between religious conscience and generally applicable laws, though rare, was not unknown in preconstitutional America. Most commonly, such conflicts arose from oath requirements, military conscription, and religious assessments. Origins of Free Exercise 1466. The ways in which these conflicts were resolved suggest that Americans in the Colonies and early States thought that, if an individual's religious scruples prevented him from complying with a generally applicable law, the government should, if possible, excuse the person from the law's coverage. For example, Quakers and certain other Protestant sects refused on Biblical grounds to subscribe to oaths or "swear" allegiance to civil authority. A. Adams & C. Em-

merich, A Nation Dedicated to Religious Liberty: The Constitutional Heritage of the Religion Clauses 14 (1990) (hereinafter Adams & Emmerich). Without accommodation, their beliefs would have prevented them from participating in civic activities involving oaths, including testifying in court. Colonial governments created alternatives to the oath requirement for these individuals. In early decisions, for example, the Carolina proprietors applied the religious liberty provision of the Carolina Charter of 1665 to permit Quakers to enter pledges in a book. Curry, The First Freedoms, at 56. Similarly, in 1691, New York enacted a law allowing Quakers to testify by affirmation, and in 1734, it permitted Quakers to qualify to vote by affirmation. Id., at 64. By 1789, virtually all of the States had enacted oath exemptions. See Adams & Emmerich 62.

Early conflicts between religious beliefs and generally applicable laws also occurred because of military conscription requirements. Quakers and Mennonites, as well as a few smaller denominations, refused on religious grounds to carry arms. Members of these denominations asserted that liberty of conscience should exempt them from military conscription. Obviously, excusing such objectors from military service had a high public cost, given the importance of the military to the defense of society. Nevertheless, Rhode Island, North Carolina, and Maryland exempted Quakers from military service in the late 1600's. New York, Massachusetts, Virginia, and New Hampshire followed suit in the mid-1700's. Origins of Free Exercise 1468. The Continental Congress likewise granted exemption from conscription:

> "As there are some people, who, from religious principles, cannot bear arms in any case, this Congress intend no violence to their consciences, but earnestly recommend it to them, to contribute liberally in this time of universal calamity, to the relief of their distressed brethren in the several colonies, and to do all other services to their oppressed Country, which they can consist-

ently with their religious principles." Resolution of July 18, 1775, reprinted in 2 Journals of the Continental Congress, 1774–1789, pp. 187, 189 (W. Ford ed. 1905).

Again, this practice of excusing religious pacifists from military service demonstrates that, long before the First Amendment was ratified, legislative accommodations were a common response to conflicts between religious practice and civil obligation. Notably, the Continental Congress exempted objectors from conscription to avoid "violence to their consciences," explicitly recognizing that civil laws must sometimes give way to freedom of conscience. Origins of Free Exercise 1468.

States and Colonies with established churches encountered a further religious accommodation problem. Typically, these governments required citizens to pay tithes to support either the government-established church or the church to which the tithepayer belonged. But Baptists and Quakers, as well as others, opposed all government-compelled tithes on religious grounds. *Id.*, at 1469. Massachusetts, Connecticut, New Hampshire, and Virginia responded by exempting such objectors from religious assessments. *Ibid.* There are additional examples of early conflicts between civil laws and religious practice that were similarly settled through accommodation of religious exercise. Both North Carolina and Maryland excused Quakers from the requirement of removing their hats in court; Rhode Island exempted Jews from the requirements of the state marriage laws; and Georgia allowed groups of European immigrants to organize whole towns according to their own faith. *Id.*, at 1471.

To be sure, legislatures, not courts, granted these early accommodations. But these were the days before there *was* a Constitution to protect civil liberties—judicial review did not yet exist. These legislatures apparently believed that the appropriate response to conflicts between civil law and religious scruples was, where possible, accommodation of re-

ligious conduct.   It is reasonable to presume that the drafters and ratifiers of the First Amendment—many of whom served in state legislatures—assumed courts would apply the Free Exercise Clause similarly, so that religious liberty was safeguarded.

## E

The writings of the early leaders who helped to shape our Nation provide a final source of insight into the original understanding of the Free Exercise Clause.   The thoughts of James Madison—one of the principal architects of the Bill of Rights—as revealed by the controversy surrounding Virginia's General Assessment Bill of 1784, are particularly illuminating.   Virginia's debate over religious issues did not end with its adoption of a constitutional free exercise provision. Although Virginia had disestablished the Church of England in 1776, it left open the question whether religion might be supported on a nonpreferential basis by a so-called "general assessment."   Levy, Essays on American Constitutional History, at 200.   In the years between 1776 and 1784, the issue how to support religion in Virginia—either by general assessment or voluntarily—was widely debated.   Curry, The First Freedoms, at 136.

By 1784, supporters of a general assessment, led by Patrick Henry, had gained a slight majority in the Virginia Assembly.   M. Malbin, Religion and Politics: The Intentions of the Authors of the First Amendment 23 (1978); Levy, *supra*, at 200.   They introduced "A Bill Establishing a Provision for the Teachers of the Christian Religion," which proposed that citizens be taxed in order to support the Christian denomination of their choice, with those taxes not designated for any specific denomination to go to a public fund to aid seminaries.   Levy, *supra*, at 200–201; Curry, *supra*, at 140–141; Malbin, *supra*, at 23.   Madison viewed religious assessment as a dangerous infringement of religious liberty and led the opposition to the bill.   He took the case against religious assessment to the people of Virginia in his now-famous "Me-

morial and Remonstrance Against Religious Assessments."
Levy, *supra*, at 201. This pamphlet led thousands of Virginians to oppose the bill and to submit petitions expressing their views to the legislature. Malbin, *supra*, at 24. The bill eventually died in committee, and Virginia instead enacted a Bill for Establishing Religious Freedom, which Thomas Jefferson had drafted in 1779. Malbin, *supra*, at 24.

The "Memorial and Remonstrance" begins with the recognition that "[t]he Religion . . . of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate." 2 Writings of James Madison 184 (G. Hunt ed. 1901). By its very nature, Madison wrote, the right to free exercise is "unalienable," both because a person's opinion "cannot follow the dictates of other[s]," and because it entails "a duty towards the Creator." *Ibid.* Madison continued:

> "This duty [owed the Creator] is precedent both in order of time and degree of obligation, to the claims of Civil Society. . . . [E]very man who becomes a member of any particular Civil Society, [must] do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society, and that Religion is wholly exempt from its cognizance." *Id.,* at 184–185.

To Madison, then, duties to God were superior to duties to civil authorities—the ultimate loyalty was owed to God above all. Madison did not say that duties to the Creator are precedent only to those laws specifically directed at religion, nor did he strive simply to prevent deliberate acts of persecution or discrimination. The idea that civil obligations are subordinate to religious duty is consonant with the notion that government must accommodate, where possible, those religious practices that conflict with civil law.

Other early leaders expressed similar views regarding religious liberty. Thomas Jefferson, the drafter of Virginia's Bill for Establishing Religious Freedom, wrote in that document that civil government could interfere in religious exercise only "when principles break out into overt acts against peace and good order." In 1808, he indicated that he considered "'the government of the United States as interdicted by the Constitution from intermeddling with religious institutions, their doctrines, discipline, or exercises.'" 11 The Writings of Thomas Jefferson 428–429 (A. Lipscomb ed. 1904) (quoted in Office of Legal Policy, U. S. Dept. of Justice, Report to the Attorney General, Religious Liberty under the Free Exercise Clause 7 (1986)). Moreover, Jefferson believed that "'[e]very religious society has a right to determine for itself the time of these exercises, and the objects proper for them, according to their own particular tenets; and this right can never be safer than in their own hands, where the Constitution has deposited it.'" *Ibid.*

George Washington expressly stated that he believed that government should do its utmost to accommodate religious scruples, writing in a letter to a group of Quakers:

> "[I]n my opinion the conscientious scruples of all men should be treated with great delicacy and tenderness; and it is my wish and desire, that the laws may always be as extensively accommodated to them, as a due regard to the protection and essential interests of the nation may justify and permit." Letter from George Washington to the Religious Society Called Quakers (Oct. 1789), in George Washington on Religious Liberty and Mutual Understanding 11 (E. Humphrey ed. 1932).

Oliver Ellsworth, a Framer of the First Amendment and later Chief Justice of the United States, expressed the similar view that government could interfere in religious matters only when necessary "to prohibit and punish gross immorali-

ties and impieties; because the open practice of these is of evil example and detriment." Oliver Ellsworth, Landholder, No. 7 (Dec. 17, 1787), reprinted in 4 Founders' Constitution 640. Isaac Backus, a Baptist minister who was a delegate to the Massachusetts ratifying convention of 1788, declared that " 'every person has an unalienable right to act in all religious affairs according to the full persuasion of his own mind, where others are not injured thereby.' " Backus, A Declaration of Rights, of the Inhabitants of the State of Massachusetts-Bay, in Isaac Backus on Church, State, and Calvinism 487 (W. McLoughlin ed. 1968).

These are but a few examples of various perspectives regarding the proper relationship between church and government that existed during the time the First Amendment was drafted and ratified. Obviously, since these thinkers approached the issue of religious freedom somewhat differently, see Adams & Emmerich 21–31, it is not possible to distill their thoughts into one tidy formula. Nevertheless, a few general principles may be discerned. Foremost, these early leaders accorded religious exercise a special constitutional status. The right to free exercise was a substantive guarantee of individual liberty, no less important than the right to free speech or the right to just compensation for the taking of property. See P. Kauper, Religion and the Constitution 17 (1964) ("[O]ur whole constitutional history . . . supports the conclusion that religious liberty is an independent liberty, that its recognition may either require or permit preferential treatment on religious grounds in some instances . . . "). As Madison put it in the concluding argument of his "Memorial and Remonstrance":

> " '[T]he equal right of every citizen to the free exercise of his Religion according to the dictates of [his] conscience' is held by the same tenure with all our other rights. . . . [I]t is equally the gift of nature; . . . it cannot be less dear to us; . . . it is enumerated with equal solem-

nity, or rather studied emphasis." 2 Writings of James Madison, at 190.

Second, all agreed that government interference in religious practice was not to be lightly countenanced. Adams & Emmerich 31. Finally, all shared the conviction that " 'true religion and good morals are the only solid foundation of public liberty and happiness.' " Curry, The First Freedoms, at 219 (quoting Continental Congress); see Adams & Emmerich 72 ("The Founders . . . acknowledged that the republic rested largely on moral principles derived from religion"). To give meaning to these ideas—particularly in a society characterized by religious pluralism and pervasive regulation—there will be times when the Constitution requires government to accommodate the needs of those citizens whose religious practices conflict with generally applicable law.

## III

The Religion Clauses of the Constitution represent a profound commitment to religious liberty. Our Nation's Founders conceived of a Republic receptive to voluntary religious expression, not of a secular society in which religious expression is tolerated only when it does not conflict with a generally applicable law. As the historical sources discussed above show, the Free Exercise Clause is properly understood as an affirmative guarantee of the right to participate in religious activities without impermissible governmental interference, even where a believer's conduct is in tension with a law of general application. Certainly, it is in no way anomalous to accord heightened protection to a right identified in the text of the First Amendment. For example, it has long been the Court's position that freedom of speech—a right enumerated only a few words after the right to free exercise—has special constitutional status. Given the centrality of freedom of speech and religion to the American concept of personal liberty, it is altogether reasonable to conclude

that both should be treated with the highest degree of respect.

Although it may provide a bright line, the rule the Court declared in *Smith* does not faithfully serve the purpose of the Constitution. Accordingly, I believe that it is essential for the Court to reconsider its holding in *Smith*—and to do so in this very case. I would therefore direct the parties to brief this issue and set the case for reargument.

I respectfully dissent from the Court's disposition of this case.

JUSTICE SOUTER, dissenting.

To decide whether the Fourteenth Amendment gives Congress sufficient power to enact the Religious Freedom Restoration Act of 1993, the Court measures the legislation against the free-exercise standard of *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990). For the reasons stated in my opinion in *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah,* 508 U. S. 520, 564–577 (1993) (opinion concurring in part and concurring in judgment), I have serious doubts about the precedential value of the *Smith* rule and its entitlement to adherence. These doubts are intensified today by the historical arguments going to the original understanding of the Free Exercise Clause presented in JUSTICE O'CONNOR's dissent, *ante,* at 548–564, which raises very substantial issues about the soundness of the *Smith* rule. See also *ante,* p. 537 (JUSTICE SCALIA, concurring in part) (addressing historical arguments). But without briefing and argument on the merits of that rule (which this Court has never had in any case, including *Smith* itself, see *Lukumi,* 508 U. S., at 571–572), I am not now prepared to join JUSTICE O'CONNOR in rejecting it or the majority in assuming it to be correct. In order to provide full adversarial consideration, this case should be set down for reargument permitting plenary reexamination of the issue. Since the Court declines to follow that course, our free-exercise

law remains marked by an "intolerable tension," *id.*, at 574, and the constitutionality of the Act of Congress to enforce the free-exercise right cannot now be soundly decided. I would therefore dismiss the writ of certiorari as improvidently granted, and I accordingly dissent from the Court's disposition of this case.

JUSTICE BREYER, dissenting.

I agree with JUSTICE O'CONNOR that the Court should direct the parties to brief the question whether *Employment Div., Dept. of Human Resources of Ore.* v. *Smith,* 494 U. S. 872 (1990), was correctly decided, and set this case for reargument. I do not, however, find it necessary to consider the question whether, assuming *Smith* is correct, §5 of the Fourteenth Amendment would authorize Congress to enact the legislation before us. Thus, while I agree with some of the views expressed in the first paragraph of Part I of JUSTICE O'CONNOR's dissent, I do not necessarily agree with all of them. I therefore join JUSTICE O'CONNOR's dissent, with the exception of the first paragraph of Part I.